*ORIGINAL*

Ronald J. McIntosh, Pro Se.
Reg. No. 12053-086
P.O. Box 8000
Marianna, FL 32447-8000

# FILED

## FEB 1 1 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| RONALD J. McINTOSH, ) | Case No. CV 09-0750 CRB (PR) |
| Petitioner ) | |
| ) | |
| v. ) | |
| ) | |
| ERIC H. HOLDER, JR., et al., ) | |
| ) | |
| Respondents. ) | |

REPLY BRIEF IN OPPOSITION
TO RESPONDENTS' RENEWED MOTION TO
DISMISS HABEAS PETITION AS UNTIMELY

by:

Ronald J. McIntosh, Pro Se.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

RONALD J. McINTOSH,

        Petitioner,

v.

ERIC H. HOLDER, JR., et al.,

        Respondents.

Case No. CV 09-0750 CRB (PR)

REPLY BRIEF IN OPPOSITION TO
RESPONDENTS' RENEWED MOTION TO
DISMISS HABEAS PETITION AS
UNTIMELY

## INTRODUCTION

In an order filed December 10, 2009, this Court directed the
Respondents to address McIntosh's claim that he is actually innocent
of the crimes for which he was convicted (conspiracy to commit
murder and murder).

First and foremost, McIntosh puts forth the fact that it was
the government that has caused such a delay in the filing of this
habeas corpus, by concealing the truth.

Second, the various affidavits put forth by McIntosh clearly
show that he did not murder Ronald Ewing, and that he did not
conspire to murder Ewing. In fact, the affidavits show that it
was David Younge who ordered the murder and then framed McIntosh
to get himself (Younge) away from the conspiracy to murder Ewing.

## FACTUAL BACKGROUND

McIntosh noted a few minor errors in the Respondents'
statement of the facts, but McIntosh will not address them at this
time. But, McIntosh wishes to bring to the court's attention that
this was a nine day trial, and the jury was out for eight days
before reaching a verdict.

1

ARGUMENT

I.   THIS CASE, AT BAR, IS ONE OF THOSE RARE AND EXTRAORDINARY
     CASES, THAT CAN PASS THROUGH THE SCHLUP GATEWAY TO ALLOW
     OTHERWISE BARRED CONSTITUTIONAL CLAIMS TO BE CONSIDERED
     ON THE MERITS

In order to pass through the Schlup gateway, Schlup v Delo
(1995) 513 U.S. 298; 115 S.Ct. 851; 130 L.Ed.2d 808, the petitioner
(McIntosh) must "present evidence of innocence so strong that a
court cannot have confidence in the outcome of the trial unless
the court is also satisfied that the trial was free of nonharmless
constitutional error, the petitioner should be allowed to pass
through the gateway and argue the merits of his underlying claims."
Id. at 327.

Further, the petitioner must present evidence of "actual
innocence" sufficient to bring his petition within the "narrow
class of cases ... implicating a fundamental miscarriage of
justice." Id. at 314-15.

The Ninth Circuit in Johnson v Knowles, 541 F.3d 933, 938 n.1
(9th Cir. 2008) noted Moore v Quarterman, 534 F.3d 454, 2008 WL
2640094, *6 (5th Cir. 2008) "recognizing the miscarriage of justice
exception is 'narrow' and only applies where the petitioner shows
'a constitutional violation has probably resulted in the conviction
of one who is actually innocent.'" The Ninth Circuit in Johnson
also noted Horton v Allen, 370 F.3d 75, 81 n.3 (1st Cir. 2004)
defining "miscarrage of justice" as "'a constitutional violation
that has probably resulted in the conviction of one who is actually
innocence.'"

More recently, the Supreme Court reiterated the Schlup
standard stating: "the Schlup standard does not require absolute
certainty about the petitioner's guilt or innocence," but rather

2

requires only that a petitioner demonstrate that it is "more likely than not any reasonable juror would have reasonable doubt" regarding his guilt. House v Bell (2006) 547 U.S. 518, 538; 126 S. Ct. 2064; 165 L.Ed.2d 1. Further stating: "... in light of the new evidence, 'it is more likely that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt.'" and a petition "'rais[ing] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by Constitutional error'; hence, 'a review of the merits of the Constitutional claims' is justified." Id. at 537.

In Smith v Baldwin, 466 F.3d 805, 812-13 (9th Cir. 2006) stated that a Schlup "actual innocence" inquiry is subject to a less stringent standard than a substantive "actual innocence" claim.

Finally, in House 547 U.S. at 536, the Supreme Court pointed out that "a fundamental miscarriage of justice exception" is designed to guard against "a fundamentally unjust incarceration."

Which is exactly what has occurred with McIntosh, the case in this petition.

McIntosh states that he did not conspire to commit the murder of Ronald Ewing and that he did not murder Ewing. Mcintosh has presented the affidavit of Carl Surrell which clearly proves that it was David Younge and Drax Quartermain's plan to kill Ewing, in furtherance of Younge's plan to get inside one of McIntosh's businesses, or at the very least to extort money.

This alone should be enough to pass through the Schlup gateway, but, let us not stop there.

3

For the purposes of argument and simplification McIntosh presents an overview of the case.

McIntosh, Anthony, and Ewing were in a business, "FITC", in California. Younge and Quartermain were East Coast Mobsters who came to California. Younge seeing what he thought was a chance to get some money. Younge thought he could use East Coast Mob tactics to get inside FITC and gain control of the money. When that was not working, as McIntosh would have nothing to do with Younge or Quartermain. Quartermain, under instruction of Younge, started selling cocaine to Anthony. Still getting no closer to the money, Younge had Quartermain kill Ewing, in the hopes that the murder would scare McIntosh into doing business with Younge.

But, this did not happen. McIntosh and Anthony went to the police and told the police everything they knew. Anthony, who was present when Quartermain killed Ewing gave details about the murder. McIntosh could only speak of the attempts Younge and Quartermain had made in an attempt to get into their business.

Upon learning that McIntosh and Anthony had gone to the police, Younge attempted to extort money from FITC.

Some years later, when McIntosh made front page news and Quartermain was becoming a financial burden to Younge. Younge decided that he would inform the police that McIntosh had hired Quartermain to kill Ewing. Thus, getting rid of Quartermain and possibly make some more points with the Federal authorities. As Younge was having his own problems back on the East Coast.

//

// •

//

4

A.    SUPPRESSION OF EXUPLATORY EVIDENCE

There is no dispute that the Respondents withheld exuplatory evidence, in violation of Brady v Maryland (1963) 373 U.S. 83. What the Respondents seem to be focussing upon is whether the withheld evidence would have had a material impact upon the jury.

McIntosh believes the impact upon the jury would have been so great, that McIntosh would have been found **not** guilty within minutes, not the eight (8) days it took the jury to find him guilty.

Had the jury known that Younge was Quartermain's boss in the East Coast Mob, that they, together, had done a number of extortions of people and businesses, that Quartermain had committed a number of very violent crimes at the bequest of Younge, that their criminal association went back nearly 15 years before the murder of Ewing. The jury would have found McIntosh not guilty.

The government withheld this evidence knowing that if it was disclosed, it would not only weaken the case against McIntosh, but it would also weaken all the cases that Younge had cooperated on, including his Mob associates.

The Respondents go on to state that Younge's background, including his cooperation, his drug dealing, his prior convictions, his relationship with Quartermain, his false testimony in other proceedings, his money laundering and fraudulent transactions, were fully explored during trial. It is true that each of these issues were touched upon, but Younge concealed the truth, there was not full disclosure about his dealings with Quartermain, his perjury, in 1982 and 1986, after he (Younge)   entered   into his cooperation agreement, and most important is the concealment of their, acting in concert, in extortions, and other physically violent crimes.

5

The full impact of the withheld evidence would have made it clear to any juror that Younge and Quartermain were attempting to get money out of FITC, using their old Mob tactics, and that McIntosh was the victim of Younge's ability to redirect the guilt of Ewing's murder from himself to that of McIntosh.

B.     SUBORNATION OF PERJURY

The Respondents point to the fact that Deborah Chandler's testimony about her involvement in transporting Quartermain to and from the murder scene. McIntosh does not address these facts, what McIntosh does address is the fact that Chandler testified at five prior court proceedings, in which she testified that it was to be a drug delivery, which she had done many times with Quartermain, and that she knew nothing about any plained murder.

Then at McIntosh trial, for the first time, Chandler testifies that she knew there was going to be a murder, and she got paid for her involvement.

This change in Chandler's testimony opened-up the door for a number of exceptions to the hearsay rule, to be introduced in as evidence.

Why did Chandler change her testimony, only after a number of days of interviews by Detective Miff Singleton, the same detective who threatened defense witness Green.    Prehaps, it was because Chandler was now serving a criminal sentence, and was coming up for parole. (note, Chandler was paroled three months after McIntosh's trial).

●  C.     WITNESS TAMPERING

Once again, Respondents does not focus on the issue of witness tampering by San Mateo Detectives, but does focus on the date of

6

April 25, 1984, and the impact of Green's would-have-been testimony. Thus, McIntosh put forth that the Respondents have admitted that the government tampered with defense witnesses.

Moving on to the date of April 25, 1984. The Respondents put forth that Younge testified that the date might have been April 23rd or April 25th, as his papers had noted a scheduled appointment for both dates. But, the Respondents ignore Ewing's wife, Ester Auniga, testimony confirming that the meeting did take place on April 25, 1984. To further support Zuniga's assertion, Zuniga produced her telephone records to further establish that the meeting did take place on April 25, 1984. Further testifying that her husband, Ronald Ewing, had told her he had a meeting with Anthony and received a check for $ 17,000.00 the evening of April 25, 1984.

As for McIntosh's attempts to subpoena Green, court appointed trial counsel refused to do so, even after McIntosh had made numerous request of trial counsel to subpoena Green. This point might better be addressed in ineffective assistance of defense counsel.

But, anyway one looks at it, the Respondents admits witness tampering, and the date of April 25, 1984, is firmly established as the date of the alleged "Eye-Ball" meeting, which McIntosh was not a party to, as he was 500 miles away with Green.

D.    VOUCHING FOR GOVERNMENT WITNESSES

The Respondents seem to admit that FBI Agent Gary Langan did vouch for Younge's truthfulness, when stating: "The grand jury transcript and declarations submitted by petitioner do not establish that Agent Langan **falsely vouched** for Younge's veracity..."

This statement, made by the Respondents, confirms that Langan

7

vouch for Younge's truthfulness. Thus, vouching for government witness is admitted.

## E.    REMAINING CLAIMS

The Respondents have grouped all the remaining claims into one section, under the pretense that these claims do not address the current issue before the court, and thus should be addressed at a later time. Perhaps this is true, but McIntosh wishes to touch on each of the remaining claims.

### CONFLICTING THEORIES USED BY THE PROSECUTOR

In McIntosh's trial the prosecutor argued that everything that Quartermain allegely told Younge was the truth, but in Quartermain's trial the prosecutor argued that Quartermain was a "chronic liar", a "fabulist", a "completely untrustworthy", and nothing he said could be trusted.

### JURY INSTRUCTIONS

The jury instructions do not go to newly discovered evidence, but the fact the jury was only required to find McIntosh guilty by a "preponderance of the evidence" surely goes a long way in establishing that McIntosh was denied a fair trial.

### OTHER ERRORS AT TRIAL

The remaining errors may be addressed at a later date, these errors include: Bifurcation of Defense, Unjoined Perpetrator Instruction, Erroneous Admission of Hearsay Statements, Juror Misconduct, Insufficient Evidence, Ineffective Assistance of Trial Counsel, Ineffective Assistance of Appellant Counsel, and Cumulative Error.

//

//

## CONCLUSION

FOR the foregoing reasons: the fact that Surrell's affidavit proves that McIntosh is actually innocent, that it was Younge's who ordered the murder of Ewing, that the government concealed exuplatory evidence, that the government did tamper with defense witnesses, and that the government did vouch for government witnesses truthfulness.

THIS case must be allowed to proceed and be heared on the merits of the claims.

Respectfully submitted,

Dated  2-12-10

Ronald J. McIntosh, Pro Se.

9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVION

RONALD J. McINTOSH,                    )
                                       )
            Petitioner,                )
                                       )        Case CV 09-0750 CRB (PR)
v.                                     )
                                       )
ERIC H. HOLDER, JR., et al.,           )
                                       )
            Respondents.               )
_____)

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that a true copy of the
foregoing, REPLY BRIEF IN OPPOSITION TO RESPONDENTS' RENEWED MOTION
TO DISMISS HABEAS PETITION AS UNTIMELY, was mailed by first class
United States Mail, postage prepaid and attached thereto, this _12_
day of February, 2010, to the attorney for the Respondents, at the
location below:

            Pamela K. Critchfield
             Deputy Attorney General
            455 Golden Gate Ave., Ste 11000
            San Francisco, CA 94102-7004

                                    R. J. M. Intosh

                            Ronald J. McIntosh

UNITED STATES POSTAL SERVICE

PRIORITY MAIL®

Flat Rate
Mailing Envelope
For Domestic and International Use

Visit us at usps.com



SAVE MORE $ BY SHIPPING ONLINE

visit usps.com



# MAIL

## UNITED STATES POSTAL SERVICE

Flat Rate
Mailing Envelo

**For Domestic and Internati**

**Visit us at usps.com**

All amount of mailable material may be enclosed, as long
as the envelope is not modified, and the contents are
entirely confined within the envelope with the adhesive
provided as the means of closure.

**INTERNATIONAL RESTRICTIONS APPLY:**

**4 POUND WEIGHT LIMIT ON
INTERNATIONAL APPLIES**

Customs forms are required. Consult the
*International Mail Manual* (IMM) at pe.usps.gov
or ask a retail associate for details.

From/Expéditeur:
R.M. 12053-086
P.O. Box 8000
MARIANNA, FL 32447
32447

## RECEIVED

To/Destinataire:

CLERK of the COURT
U.S. DISTRICT COURT
N. DIST. CALIF.
450 GOLDEN GATE AVE
SAN FRANCISCO, CA
94102

FEB 11 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LEGAL MAIL

USPS packaging products have been awarded Cradle
to Cradle Certification™ for their ecologically-intelligent
design. For more information go to mbdc.com/usps

Cradle to Cradle Certified™ is a certification mark of MBDC.



EP14F

**PRESS FIRMLY**

POSTAGE REQUIRED.

U.S. OFFICIAL MAIL
PENALTY FOR
PRIVATE USE $300

UNITED STATES POSTAL

02 1P
0004107436
$ 000.000
PITNEY BOWES
000.000
FEB 09 2010