Pages 1 – 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

```
RONALD MCINTOSH,                  )
                                  )
             Plaintiff,           )
                                  )
  VS.                             ) NO. C-09-0750 CRB
                                  )
ERIC HOLDER, et al.,              )
                                  )  San Francisco, California
             Defendants.          )  Friday
                                  )  February 27, 2015
_____   )  10:09 a.m.
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:           BOERSCH SHAPIRO LLP
                         235 Montgomery Street
                         Suite 835
                         San Francisco, California  94104
                   BY:   DAVID WILLIAM SHAPIRO, ESQ.


For Defendant Holder:    OFFICE OF THE U.S. ATTORNEY
                         450 Golden Gate Avenue
                         San Francisco, California  94102
                   BY:   DEBORAH R. DOUGLAS
                         Assistant U.S. Attorney


Reported by:             BELLE BALL, CSR #8785, CRR, RDR
                         Official Reporter, U.S. District Court


 (Appearances continued, next page

APPEARANCES, CONTINUED:


For Defendant Attorney General, State of California:
                     CA STATE ATTORNEY GENERAL'S OFFICE
                     455 Golden Gate Avenue
                     Suite 11000
                     San Francisco, California  94102-7004
          BY:  PAMELA K. CRITCHFIELD
               DEPUTY ATTORNEY GENERAL

```
 1   FRIDAY, FEBRUARY 27, 2015                      10:09 A.M.

 2                        P R O C E E D I N G S

 3         THE CLERK:  Calling Case C-09-0750, Ronald McIntosh

 4   versus Eric Holder.  Appearances, Counsel.

 5         MR. SHAPIRO:  Good morning, Your Honor.  David

 6   Shapiro for the petitioner Ron McIntosh.

 7         MS. CRITCHFIELD:  Pam Critchfield for the respondent

 8   State of California.

 9         MS. DOUGLAS:  Good morning, Your Honor.  Deborah

10   Douglas representing the United States, standing in for AUSA

11   Wilson Leung, who is currently outside of the country.

12         THE COURT:  So this matter is on for -- for

13   consideration of remedies relating to discovery.  Something

14   that traditionally I don't handle, but in this matter I've

15   decided to handle it because I'm somewhat perplexed by the

16   lack of compliance with the Court's orders in connection with

17   the discovery.

18      I guess in particular, the federal government produced

19   nothing in this case.  Is that right?

20         MR. SHAPIRO:  Well, it sent me a letter.

21         THE COURT:  Yeah.

22         MR. SHAPIRO:  And the letter had with it a stack of

23   newspaper -- copies of newspaper articles related to the case.

24         THE COURT:  That's all they have.

25         MR. SHAPIRO:  That's right.
```

1          **MS. DOUGLAS:**  Your Honor, if I can briefly --

2          **THE COURT:**  You just have some newspaper articles  in

3    your --

4          **MS. DOUGLAS:**  Your Honor, if I could --

5          **THE COURT:**  The custody of the United States

6    government, has some newspaper articles.  Did you get them out

7    of the Library of Congress, or the Smithsonian?  Or what?

8          **MS. DOUGLAS:**  Your Honor, that statement that the

9    government produced nothing is palpably not true.  I have a

10   copy of a letter.

11         **THE COURT:**  No; he said that they produced newspaper

12   articles.

13         **MS. DOUGLAS:**  That's part of it, Your Honor.  I have

14   a copy of the letter that AUSA Wilson Leung sent to

15   Mr. Shapiro, April 2, 2014.  Mr. Leung went through every item

16   on this Court's discovery letter, responded to every single

17   one of them.

18      Based upon the file, I know for a fact that Mr. Leung went

19   through great efforts to contact --

20         **THE COURT:**  No.  My question is -- I under -- my

21   question is:  Did they produce anything?  Not what was their

22   response, but what was their response in connection with the

23   production?

24      And, is it true that the only thing they produced were

25   some newspaper articles?  Or did they produce something else?

 1          **MS. DOUGLAS:**  It's not true that the only thing the

 2   federal government produced was newspaper --

 3          **THE COURT:**  What else?

 4          **MS. DOUGLAS:**  Based upon extensive research by the

 5   government, very, very diligent, as the Court knows, this --

 6   this --

 7          **THE COURT:**  No, my question is:  What did --

 8   Ms. Douglas, listen to me:  What did they produce?

 9      I'm not asking were they diligent, were they honest, did

10   it take a lot of time.  I'm asking you a very, very specific

11   question.

12          **MS. DOUGLAS:**  Your Honor, that was the next thing out

13   of my mouth.

14          **THE COURT:**  No, no; I want it to be the first thing

15   that's answered.

16          **MS. DOUGLAS:**  All right.  So the government produced,

17   after obtaining permission from Washington, D.C. --

18          **THE COURT:**  No, I don't want to hear that.  I want to

19   know what the government produced.

20          **MS. DOUGLAS:**  Potential *Giglio* --

21          **THE COURT:**  After you tell me -- listen:  After you

22   tell me what the government produced, you then, if I'm

23   interested, can tell me how it came to be that they produced

24   this, or what they searched, and so forth.

25      But I want to start -- so -- though I have the morning, I

1    want to start with getting people to tell me -- to answer my

2    questions directly.  Then if they need to explain it, I'll let

3    you explain it.

4            **MS. DOUGLAS:**  The government produced all the *Giglio*

5    in the government's possession involving the cooperation of

6    the two witnesses with a prior government case, having nothing

7    to do with the State prosecution here.

8            **THE COURT:**  Okay.  So you produced the *Giglio*

9    materials that were in the government's files.  Is that

10   correct?

11           **MS. DOUGLAS:**  That's correct, Your Honor.

12           **THE COURT:**  Okay.  Mr. Shapiro, is that correct?

13           **MR. SHAPIRO:**  No.  What -- what -- I'm trying to find

14   Mr. Leung's letter to me.  He wrote me a letter.

15           **THE COURT:**  Give -- Ms. Douglas will hand it to you.

16       Hand it to him.

17       (Request complied with by Ms. Douglas)

18           **MR. SHAPIRO:**  He wrote me a letter which Ms. Douglas

19   has, and he basically told me what was in the public record:

20   that Ronald Raiton was a government informant, cooperator,

21   testified that -- nothing that I hadn't already written in my

22   motion.

23       I then wrote a letter which I submitted to the Court in

24   Document 66, which was back in February of 2014.  I wrote a

25   letter to Mr. Leung, asking him:  Well, what did you do?

1    Because this isn't close to being what somebody in a civil

2    discovery response would do.  He never responded to that

3    letter.

4        And I asked:  Where did you look?  What did you find?  You

5    know, these are the kinds of places you ought to look.

6        One of the things I said to him when we were in court, not

7    in front of Your Honor, was some of the information I want, I

8    know will be in WITSEC -- witness security -- application,

9    because I filled them out.

10       And he said:  You'll never get that.  That's what he said

11   to me.  Now, that doesn't mean that I'm not entitled to it,

12   that he couldn't file it with Your Honor in camera and say:

13   Here's why David Shapiro shouldn't be allowed to look at it.

14   But, I never got anything.  No DEA report, no FBI report, no

15   ATF report.  All agencies that were involved with these

16   witnesses, Quartermain and Raiton.

17       (Reporter interruption)

18        **MS. DOUGLAS:**  Your Honor, the government would like

19   to hand up for the Court's review, not as part of the public

20   record -- and the reason I say this is based upon the -- this

21   is pursuant to the Court's protective order.  It is a

22   violation of criminal law to disclose the matters contained in

23   this letter in the public record.

24       But I would like to hand this up to the Court, so the

25   Court can see the government's response, April 2, 2014, where

1  Mr. Leung went through every item on this Court's discovery

2  order and responded to each one of them.

3       (Document handed up to the Court)

4       (The Court examines document)

5       **THE COURT:**  Well, they say that they don't have --

6  they go through the request.  And, I think they have responded

7  to it.  I can understand that you believe that the response is

8  incomplete.

9       For example they say the government is searching for

10  information relating to Raiton's cooperation.  Okay.  Is that

11  an answer?  I don't know whether it is or not.  Just says

12  they're looking for something.

13       And then, and then they go on -- they don't say:  Here it

14  is or it isn't there.  They say:  We're looking.  That was in

15  2014.  They say, we're looking for it.  But of course, that's

16  exactly what they have to do when I issue an order of

17  discovery, is to look for it.

18       So to tell -- tell the opposite party "We're looking for

19  it" isn't an answer.  It's simply a -- a process that's under

20  way, in my -- I guess, am I supposed to take from this,

21  Ms. Douglas, that now a year afterwards, there was no such

22  information?

23       **MS. DOUGLAS:**  That is absolutely correct, Your Honor.

24  Based upon Mr. Leung's representation to me.

25       **THE COURT:**  Okay.

1       **MR. SHAPIRO:**  That, Your Honor, is why I originally

2   asked you to allow me to take Mr. Leung's deposition, or at

3   least order him to tell me what he did.  He wouldn't tell me.

4   I cannot believe that.  I cannot believe there isn't a WITSEC

5   application.

6       Mr. Langan (Phonetic), who is the FBI agent, said he spent

7   hundreds of hours with Raiton.  Hundreds.  Not one FBI report.

8   I find an ATF report about Quartermain in the state's files.

9   One.  Which was not disclosed to McIntosh's lawyer.

10      So, it's impossible.  These were people who were

11  committing crime after crime after crime.  There are hundreds

12  of reports.  And for the government to say "We don't have any,

13  we can't find anything" is -- that's palpably false.  It can't

14  be true.

15      **THE COURT:**  No, no.  What can be true, what can be

16  true, because an Assistant U.S. Attorney comes in front of a

17  federal judge and says "I can't find any," I can accept that.

18  That he can't find it.  He can't find it.

19      But that's not the end of the inquiry.  Because the

20  question is there reason to believe that it actually exists,

21  notwithstanding the fact the Assistant U.S. Attorney can't

22  find it, that's the question.

23      So, I have before me an attorney for a party, who actually

24  was the United States Attorney.  So it's not like he's

25  unfamiliar with how things work.  He was a United States

1   Attorney in this district.  So, I would guess that if he says,

2   "Based upon my experience, I think that" -- you know, "I have

3   reason to believe that these things exist in the government

4   files," I would pay some attention to that.

5        And also, he says, here are the things that occurred,

6   which in the normal course would give rise to these documents.

7   That's plausible.

8        So, one thinks then, Ms. Douglas, that perhaps the -- the

9   search wasn't the appropriate search.  Under the

10   circumstances.  You tell me it was.  But I think that there is

11   sufficient justification to find out what was the scope of the

12   search.  And only Mister -- is it Mr. Wilson?  Is that, Wilson

13   Leung, who is the Assistant U.S. --

14              **MS. DOUGLAS:**  Mr. Leung.

15              **THE COURT:**  Mr. Leung will have to tell the Court

16   that.  Now, we can do so, and maybe where we go next is he

17   files a declaration detailing exactly what files he searched,

18   and how he conducted the search.  What inquiry he made, what

19   files he reviewed.

20        And, and I could take his letter of April 2nd, 2014, and

21   your representation that as of today, February 27, 2015, this

22   material does not exist.  Because all he says in 2014 is "I'll

23   look for it."  That's what he's saying.  "I'll look for it."

24   And he says "By the way, I was I found some newspaper

25   articles."  Okay.  And he turned them over.

1    I find it difficult to believe there aren't -- there

2    aren't documents of the type that Mr. Shapiro has -- has

3    requested.  I find that difficult to believe.

4         **MS. DOUGLAS:**  Your Honor, the government would like

5    to respond, when the Court is ready.

6         **THE COURT:**  I'm ready.

7         **MS. DOUGLAS:**  All right.  So, Mr. Leung did submit a

8    declaration setting forth his efforts in connection with the

9    protective order that this Court signed.  And what Mr. Leung

10   said in that declaration --

11        **THE COURT:**  Okay; do you have that?

12        **MS. DOUGLAS:**  I was just looking -- I have the

13   protective order (Indicating).  I was just looking for the

14   actual declaration which --

15        **THE COURT:**  Okay.  Well, let's find it.  Let's find

16   it, and I can look at it as well as the -- so I can follow it.

17   Unless you want to hand it up, and I'll take a look at it that

18   way.  But I think this would be useful to have it in front of

19   me, to see what he said.

20        **MS. DOUGLAS:**  I have it, Your Honor.

21       Handing it up to the Court.

22        **THE COURT:**  All right.  Thank you.

23       (Document handed up to the Court)

24       (The Court examines document)

25        **THE COURT:**  Okay, this is Mr. Wilson Leung's

```
1   declaration, filed April 2nd, 2014, which is the same date as

2   the letter you handed up to me.

3       Okay.  Now, where do you want me to look?

4           MS. DOUGLAS:  I think it is on that very page that

5   the Court has.

6           THE COURT:  Says "Following my" -- Paragraph 6?

7   (As read)

8           "Following my discussions with Mr. Shapiro I tried to

9           locate any responsive information.  I tried to..."

10      And he says:

11          "I found none."

12      Which is not surprising, given the petitioner is not

13  prosecuted.  And then:

14          "I sought the assistance of other components of the

15          federal government.  The search took a bit of time.

16          But in response to the request for assistance, I

17          received information dating back approximately three

18          decades which may be considered impeachment

19          information.  Such information, however, relates to

20          federal witness security program..."

21      And then:  It should be part of the protective order.  So,

22  you say that's his response.  Yes, it's his response.

23      He doesn't say what he -- he doesn't say how he conducted

24  the search, other than "I asked some people."

25      How do I look at this and say, "Oh, well, there, he
```

```
 1    conducted an adequate search"?  I have no idea what he did.

 2    He could have turned to his roommate and asked him, "Do you

 3    know where there are any documents?"

 4        "No."

 5        "Okay, well, thank you very much."

 6        "I asked."

 7        I don't suggest he didn't.  But I suggest that when the

 8    United States government says that they conducted a search,

 9    they file -- they -- the search is -- is a meaningful search.

10    This doesn't have any -- no way of looking at this to

11    determine what the scope of the search was.

12            MS. DOUGLAS:  Your Honor, I have the -- Mr. Leung's

13    file.  And I know that that search included contact with the

14    Office of Operation Enforcement in Washington, D.C.  He had to

15    get authorization to disclose the Giglio, under the

16    circumstances.  I know for a fact --

17            THE COURT:  That is not a search, of course.  What

18    you are saying is he found something, and then he needed

19    permission to disclose it.  Well, that's not a search.  It was

20    -- covered in the search --

21            MS. DOUGLAS:  And I know for a fact that Mr. Leung

22    contacted the Eastern District of Pennsylvania who had the --

23    the -- who dealt with these witnesses 25 years ago; and I know

24    for a, fact based upon the correspondence, that the Eastern

25    District of Pennsylvania did a thorough search and they gave
```

1    Mr. Leung --

2            **THE COURT:**  By the way, how do you know that?  I

3    mean, how do you know that?  How do you know what the Eastern

4    District did?  Do you have a letter from them saying what they

5    did?

6            **MS. DOUGLAS:**  I have an email which --

7            **THE COURT:**  Well --

8            **MS. DOUGLAS:**  Which I -- I have a privileged email

9    from them.  So I know that they went through great efforts to

10   find whatever they had, based upon -- based upon a trial that

11   happened 25 years go ago.

12           **THE COURT:**  Of course, let's -- I understand that we

13   have certain problems in connection with the passage of time.

14   And that may explain any number of things.  I understand that.

15           **MS. CRITCHFIELD:**  (Nods head)

16           **THE COURT:**  Which explanation may be perfectly valid.

17   Notwithstanding that, I need to know whether certain things

18   exist.  Not why they don't exist, but whether they exist.

19      Now you are telling me that this email that is in your

20   office files satisfy -- would satisfy the Court's concern as

21   to whether or not an adequate search had been made.

22           **MS. DOUGLAS:**  Yes, Your Honor.

23           **THE COURT:**  Fine.  Okay.  So, this will be easy.

24   This will be very easy.  I want Mr. Leung or any

25   representative of your office to file with the court a

```
 1   detailed declaration stating exactly what searches were

 2   conducted, who was contacted, how were they contacted, and

 3   what response they gave.  That will be very easy.

 4          MS. DOUGLAS:  Your Honor, can I address an underlying

 5   -- really, what's the gut -- what the gut of this issue is.

 6          THE COURT:  Do you understand what -- let me just

 7   say -- let's make sure that we don't leave this subject

 8   without -- is there anything else -- I want to address

 9   Mr. Shapiro for a movement.

10      Anything else that ought to be in this declaration?

11          MR. SHAPIRO:  Well, to supplement what Your Honor

12   said, Ms. Douglas raised something that I think is a -- is an

13   important point.  She referred to an office at the Department

14   of Justice it is called the Office of Enforcement Operations,

15   OEO.  OEO is the office that approves every single wiretap,

16   and then another part of it approves all the WITSEC

17   applications.

18      OEO began doing WITSEC in the seventies.  Quartermain may

19   have been one of those first people who got into that.  He was

20   in the WITSEC program.  And I remember putting witnesses in

21   the WITSEC program, and being told about some disasters.

22   Somebody who was in and then killed somebody.

23          THE COURT:  All you have to do is read the book.

24          MR. SHAPIRO:  Right.  So, so --

25          THE COURT:  What is it called?  "WITSEC."
```

1           **MR. SHAPIRO:**  Witness security.

2           **THE COURT:**  It is a great book.

3           **MR. SHAPIRO:**  Yeah.  Yeah.  Yeah.  I knew the lawyer

4    who started it, from having a number of witnesses in there.

5       So, if Mr. Leung called OEO, the question is:  Did you

6    have a file on Quartermain, did you have a file on Raiton?  Is

7    it gone?  Was it destroyed?  If it's not, where is it?  What's

8    in it?  Why don't you want to produce it?  Can we give it to

9    the Judge to look at?  I mean, those are the kind of things

10   that --

11          **THE COURT:**  Of course, but Mr. Leung is -- Mr. Leung

12   will have to say now in the declaration what did he do.  I

13   don't want it in a conclusory way.  What exactly -- to the

14   best of his recollection, if it was verbal, what did he say.

15   If it was in writing, what is the written document.  If, in

16   fact, there was a response, who responded.  If it was verbal,

17   what was said.  And if it's in writing, you produce the

18   written material.  The written document.

19      I want to know the full extent of the searches that were

20   conducted by Mr. Leung with respect to the items which I

21   ordered to be produced.  To which there apparently isn't any

22   material, other than --

23          **MR. SHAPIRO:**  Newspaper articles.

24          **THE COURT:**  -- newspaper articles, which may be the

25   truth.  I'm not saying it's not the truth.  I don't know.  And

1    the fact that Mr. Shapiro says that it's hard to believe that

2    there aren't these documents, I think is true but over the

3    passage of time they may not presently exist.

4        So, so, while I think he has an absolutely legitimate

5    interest or -- or suspicion, I guess, when told there are not

6    these materials, because it's hard to believe for the Court

7    that they at one time didn't exist, it may be that they

8    presently don't exist.

9        But the way -- the answer to that question is:  What was

10   the search?  And, if the search was -- was comprehensive and

11   detailed, and we know who conducted the searches and we know

12   what they were asked, and we know what their responses are,

13   that may end those matters.  It may bring it to a conclusion.

14       But this is going in the wrong direction, because notice

15   for a year -- a year?

16           **MR. SHAPIRO:**  Over.

17           **THE COURT:**  I have now for a year tried to keep the

18   discovery requests cabined by -- not just for cost but the

19   energies involved in connection with a case, as you

20   continue -- as the government points out, it's 25 years old.

21   I understand that.  But, you know, it's not like records

22   haven't been kept.  Records are kept, all the time.

23       So, do you understand, Ms. Douglas, what I am ordering

24   Mr. Leung to do?  Do you understand that?

25           **MS. DOUGLAS:**  I do.

```
 1          THE COURT:  Because it's not you; I know you are here
 2   today, but this isn't your case.  You're not the Assistant
 3   United States Attorney in charge.  He is.  And he's not here.
 4   But I want him -- I want it to be very clear as to what he now
 5   has to do.
 6          MS. DOUGLAS:  Yes, Your Honor.
 7      If I could address the underlying issue here, and that is
 8   the federal government's disclosure obligations under the law.
 9   Mr. Shapiro's client is in -- in prison based upon a state
10   prosecution, which the federal government had absolutely no
11   involvement in.
12          THE COURT:  Who knows?  I don't know that.  I don't
13   know what they --
14          MS. DOUGLAS:  We have the State right here
15   (Indicating).
16          THE COURT:  I don't care what -- she wasn't there.
17      Were you?
18          MS. CRITCHFIELD:  No.
19          THE COURT:  No.  And by the way, you weren't, either.
20   And nor was Mr. Shapiro, nor was I.  So I think it's very
21   dangerous to start saying what happened ten, 25 years ago,
22   when all you are saying is "Somebody told me what happened" or
23   "This is my best guess."
24      I'm not asking anybody to guess.  I'm not asking anybody
25   to -- to not -- I'm not asking anybody to -- to base their
```

1   opinions on what somebody else said, unless what they said was

2   based upon the fact that they conducted a search or looked for

3   a document, and it is or isn't there.

4       And by the way, I'm not going to re-litigate the

5   legitimacy of the Court's order in directing that these things

6   be produced.  You may be upset or not like what I've ordered,

7   or think I'm wrong.  I understand that.  You're an advocate

8   for your client.  I understand that.  You objected to these

9   being produced in the first -- I understand that.

10      But, I am not spending today asking -- revisiting the

11  question of whether or not these requests were legitimately

12  ordered by the Court.  The fact of the matter is they were.

13  That's the -- I mean, they have been ordered.  And, that's

14  what's going to be enforced.  And, these responses are, in the

15  Court's view, totally inadequate.

16      So, I want the declaration.  And if you would be so kind,

17  when is Mr. Wilson returning?

18          **MS. DOUGLAS:**  March 9th.

19          **THE COURT:**  March 9th.  Fine.  Okay.  The responses

20  to be filed on or before March 13th.

21          **MS. DOUGLAS:**  The government's declaration.

22          **THE COURT:**  Yes.  The declaration as to what I want

23  him to tell us.  And, is there anything about what I've said

24  that is unclear as to what he's got tell us?

25          **MS. DOUGLAS:**  No, Your Honor.  But I would be remiss

```
 1   if I didn't say the following:  This is Mr. Shapiro's third

 2   discovery motion.  After his second one, --

 3            THE COURT:  No, yeah, go ahead.

 4            MS. DOUGLAS:  -- this Court issued an order saying

 5   petitioners failed to establish the respondents have not fully

 6   complied with this Court's discovery orders.

 7        Now, the government has made full efforts to comply,

 8   notwithstanding the fact that for the first discovery order,

 9   the government was not served, we were not party, we did not

10   have an opportunity to contest it.

11            THE COURT:  Are you arguing the legitimacy of the

12   orders?  Is that --

13            MS. DOUGLAS:  I'm saying, Your Honor, based upon -- I

14   don't see a basis for compelling the federal government to

15   produce things that are not in our possession.

16            THE COURT:  You think the Court's wrong.  That's what

17   you think, the Court's wrong.  I know you think the Court's

18   wrong.  I know.  I did this a year ago, I guess, a year ago.

19   The Court -- every day, the Court makes rulings.  Half the

20   people who leave the Court think the Court's wrong.

21        Okay.  Okay.  Maybe you will think I'm right about

22   something, eventually.  But, you thought I was wrong.  That's

23   okay.  I don't take it personally.  I bet I probably could,

24   but I don't.  I don't take it personally.

25        I order things to be done.  Sometimes I think I'm right --
```

1   I always think I'm right, and sometimes I am.

2          **MS. DOUGLAS:**  Your Honor --

3          **THE COURT:**  But sometimes I am wrong.  Nevertheless,

4   Ms. Douglas, I guess this is -- I just want to make this

5   clear.  I don't really want to argue the legitimacy of the

6   Court's orders with respect to discovery.  I now have moved

7   beyond that.  Way beyond that.  And all I want to know at this

8   point is what was the scope of the search.

9          And if it's unsatisfactory, if the response is

10  unsatisfactory, I then will have no choice other than simply a

11  demand that your office have -- be deposed.  I'm trying to do

12  this, rather than having the deposition taken.

13         **MS. DOUGLAS:**  Your Honor, the government will comply;

14  we'll submit the declaration by March 13th.

15         The point I was making is notwithstanding the government

16  did not have the opportunity to contest the first motion, we

17  have -- we, the government, has done diligent efforts to

18  comply.  And, that's what Mr. Leung's declaration will show.

19  And, he will submit it by March 13th.

20         **THE COURT:**  Great.  I hope you are right.  I

21  sincerely hope you are right.  I sincerely hope that

22  Mr. Leung's declaration will demonstrate the -- the -- by its

23  inclusiveness, the steps that were taken, that anybody could

24  go back and take a look at and say, "Well, look, he did these

25  six things, he said these things, here's the -- here is his --

1    he received these responses, he spoke to these people.  These

2    people, these other people in different jurisdictions did --

3    represented to Mr. Leung that they did certain things," and

4    it's all there.  That's fine.  That's fine.

5        I'm -- I hope that is the case.  Because if that's the

6    case, that may very well be the end of this line of inquiry.

7    I'm as anxious as is the government to bring this to a

8    resolution.  A resolution as to what happens next.

9        But we can't figure out what happens next unless we know

10   what happens now.  That's the first step, or that's a step in

11   the process.  Okay.

12           **MR. SHAPIRO:**  Your Honor, I'm sorry.

13           **THE COURT:**  Sorry?

14           **MR. SHAPIRO:**  I would like that declaration to also

15   include the dates on which those --

16           **THE COURT:**  Absolutely.

17           **MR. SHAPIRO:**  Those things were --

18           **THE COURT:**  Absolutely.  It has to be a totally

19   inclusive, detailed -- and I want to emphasize the word

20   "detailed" -- declaration of names of people, who he spoke to.

21   Dates he had the conversations.  What exactly was said in what

22   form, to the best of his recollection.  And what exactly was

23   the response, to the best of his recollection.

24       And, where there are written communications evidencing

25   these contacts, they are to be included in the declaration as

1   an exhibit.

2           **MS. DOUGLAS:**  Your Honor --

3           **THE COURT:**  And the declaration being filed under

4   seal.  Okay?

5           **MS. DOUGLAS:**  The declaration may be filed under

6   seal.

7           **THE COURT:**  Yeah.  I want a copy, I want a copy to be

8   provided to Mr. Shapiro, subject to the protective order.

9           **MS. DOUGLAS:**  Under seal.

10          **THE COURT:**  Under seal.  Well -- yeah, give it to

11  him.

12          **MS. DOUGLAS:**  Your Honor, some of those

13  communications are confidential communications.

14          **THE COURT:**  Really?  Really?  Confidential

15  communications?

16          **MS. DOUGLAS:**  Yes.

17          **THE COURT:**  Under what -- fine.  To the extent --

18  Ms. Douglas, you are not listening.

19          **MS. DOUGLAS:**  I am, Your Honor.

20          **THE COURT:**  Okay.  To the extent there are

21  communications which you believe in good faith ought not to be

22  disclosed to Mr. Shapiro, you are to file those separately to

23  be given to the Court in camera.  Okay?

24      So, when the day is over, as we say, on March 13th, the

25  Court will have either one or two declarations, both of which

```
1    may be filed under seal.  One of which may be filed in camera.

2         And as to the in-camera disclosures, it will -- it will

3    have two aspects to it.  First, it will be the substance, or

4    that is to say, it will be that which you believe need not or

5    should not be disclosed to Mr. Shapiro.  So, it will contain

6    the materials that you believe to be confidential.  And

7    secondly, it will contain a statement as to why it's

8    confidential.  The authority for it being confidential.

9         Okay?

10             MR. SHAPIRO:  Can I get a copy of that statement so

11   that I --

12             THE COURT:  Maybe or maybe not.  You don't have to

13   initially do it.  I don't want to put any impediments to the

14   government's disclosure to the Court.  And yes, I will take a

15   look.

16        First of all, I haven't seen the declaration.  I don't

17   know.  I haven't seen the in-camera or the other declaration.

18   And I'll make a judgment as to whether you get any portion of

19   it.

20             MR. SHAPIRO:  I understand.  You may recall that I've

21   disputed the government's view about that statute that

22   Mr. Leung cited.  I don't think any -- there's any statute

23   that prohibits the government from turning over the

24   information that I'm seeking.

25             THE COURT:  Be that as it may, I'm not going to get
```

```
 1    into an argument over that in the abstract.  I'm going to

 2    require the government to disclose, and then from there we

 3    will take it from there.  Okay?  One small step at a time.

 4         MS. DOUGLAS:  Your Honor, if Mr. Leung determines

 5    that items should be submitted to this Court in camera, those

 6    will not be disclosed to the defense lawyer until this Court

 7    makes a determination, correct?

 8         THE COURT:  Yes.  Yes.

 9         MS. DOUGLAS:  Yes.  All right.

10         MR. SHAPIRO:  There was another component to my

11    motion, if we're -- if we've resolved the federal government.

12    And that was it was less focused on the State, but there were

13    things that I still believe were deficient.

14         THE COURT:  The State's been very patient in

15    listening to this contretemps.  And I guess we should move to

16    the State's portion of the motion.

17         And in that regard, the is okay.  There are three things

18    that were listed.  One is the District Attorney, by Martin

19    Murray -- and I understand he is retired now?

20         MS. CRITCHFIELD:  Correct.

21         THE COURT:  -- shall conform its answers -- shall

22    conform its Answers to Interrogatories to the provisions in

23    the Federal Rules of Civil Procedure including, without

24    limitation, answering each interrogatory under oath.

25         I believe that's been done, is that correct?
```

```
 1        MS. CRITCHFIELD:  He -- Mr. Murray signed an
 2   under-penalty-of-perjury declaration at the end of the
 3   interrogatories.  Apparently, Mr. Shapiro doesn't think that's
 4   good enough.
 5        MR. SHAPIRO:  No, no, no.  No.  I think that's good
 6   enough.  That was served on me only after I filed my motion.
 7        THE COURT:  Yeah.
 8        MR. SHAPIRO:  But the problem is that the
 9   interrogatories that you authorized defined "YOU," in all
10   capitals (Indicating quotation marks), as not just Mr. Murray.
11   And rather, that included other office -- other members of the
12   D.A.'s office who may have worked on the case, and the
13   investigators.
14     Mr. Murray did nothing to try to find out the answers to
15   most of those questions.  So he simply said "I don't
16   remember," which is typically a way somebody has of hedging
17   his bets when he wants to say no.  But, maybe he doesn't
18   remember.
19     But he could remember, as in a Rule 30(b)(6) deposition,
20   by going to talk to other people.  For example, the two
21   detectives worked on the case.  And, he didn't do that,
22   apparently.
23        THE COURT:  Well, but you see, I think that's not
24   necessarily -- under sort of a 30(b)(6) he might be
25   responsible for doing that.  I'm not sure his responsibilities
```

1   are to go talk to other people.

2       However, after saying that, I think it's the State's

3   responsibility when they respond to these interrogatories,

4   that they are saying that they -- that had they've conducted

5   the necessary inquiry of these individuals.

6       Putting it another way, that Mr. Murray doesn't know or

7   doesn't have recollections of these things, that's fine.  That

8   is to say, that is his answer.  And that's fine.

9       But there are other people who are in a position to

10  possibly have information on these subjects.  And my

11  understanding of the State's response is that the State hasn't

12  made an inquiry of those people.  And maybe all we have to do

13  is take a suggested list -- maybe that's one way to get it

14  done -- from Mr. Shapiro:  Did Detective X, Detective Y,

15  Prosecutor Z and so forth, and he simply furnishes that list

16  to you, and you make an inquiry of these people.  And then

17  they file a declaration saying they have no knowledge, or they

18  do.

19      I mean, we're not asking for everybody who might, because

20  that seems to me to be maybe an enormous burden on the State,

21  in light of the passage of time.

22          **MS. CRITCHFIELD:**  Yes.

23          **THE COURT:**  Notwithstanding that the Plaintiff would

24  like that to be done.  But, I think -- I think that you can

25  fashion an interrogatory, as an example, of Detective X which

1    says "Do you or anyone else within your knowledge know or have

2    information about X?"

3           MR. SHAPIRO:  I can do that.

4           THE COURT:  So it can be broad enough that if the

5    deponent or the declarant says "I can't remember, I can't

6    remember but I talked to..." you know, "I worked on this case

7    with Inspector X.  Okay, you are asking me what do I remember?

8    I don't remember any of the things that you are asking.  But I

9    worked on it with X."

10        So he is the person that may have an independent

11   recollection of what happened or may not.  Yes.

12          MS. CRITCHFIELD:  Okay.  The detectives that

13   Mr. Shapiro is referring to are -- were with the San Mateo

14   County Sheriff's Department.  And this is from the 1980s.  I

15   have no idea where they are.  My guess is they're both retired

16   at this point.

17          THE COURT:  Uh-huh.

18          MS. CRITCHFIELD:  Now, I can call the Sheriff's

19   Department in San Mateo County and find out where they are.

20   Maybe through some retirement records.

21          THE COURT:  I guarantee it.  They're getting a check.

22   Somebody knows where they are.

23          MS. CRITCHFIELD:  Okay.

24          THE COURT:  Go talk to CalPERS.  They'll say --

25          MS. CRITCHFIELD:  And, I can do that.  And just like

1    I did with Mr. Murray -- who, by the way, did not answer the

2    interrogatories "I don't recall."  He answered them very

3    fully, if the Court would read them.

4        **THE COURT:**  I'm not going into that.  That's fine.

5    I'm not saying Mr. Murray's responses were inadequate.  Okay.

6        **MS. CRITCHFIELD:**  So what you are asking me to do,

7    then, is to contact the San Mateo County Sheriff's Department,

8    try to locate two detectives who worked there in 1986, 1987,

9    1988.

10       **THE COURT:**  Right.  I know that is not

11   insurmountable.  I worked in the San Francisco D.A.'s office

12   in 1967.  I can tell you what happened to the -- the

13   investigators that I worked with.  That's not -- that's 40

14   years ago.

15       **MS. CRITCHFIELD:**  And then, ask them to answer the

16   interrogatories propounded by Mr. Shapiro.

17       **THE COURT:**  Great.  Thank you very much.  That will

18   be the order, and I appreciate your offer in that regard.

19      Okay.  So we are moving to the second thing, which is:

20   The state and federal government shall produce photographs of

21   Weston and Raiton from in or about 1981.

22      What is the status of that request?

23       **MS. CRITCHFIELD:**  We have -- the State of California

24   has produced every piece of paper we have in response to -- or

25   that has anything to do with the Quartermain, Anthony or

 1   McIntosh appellate files.  The San Mateo County District

 2   Attorney -- and I have a declaration from her which was filed

 3   previously with the Court (Indicating) -- has said under oath

 4   that she has -- she has provided every piece of information

 5   that San Mateo County District Attorney's Office has with

 6   respect to the McIntosh, Quartermain and Anthony cases that

 7   were in their archives, and anywhere.

 8        So at this point if the photos aren't there, --

 9            THE COURT:  Not there --

10            MS. CRITCHFIELD:  -- we don't have them.

11            THE COURT:  Okay.  Well --

12        MR. SHAPIRO:  I think that the State has limited its

13   search to the San Mateo County D.A.'s office.  And it may very

14   well be that the D.A. office has not kept copies of those

15   photographs, but that doesn't mean that state agencies doesn't

16   have copies of photographs.

17        For example, let's just -- as an example, Mr. Raiton who

18   lives in Tiburon, is driving along; he gets stopped by the

19   police.  If they were to run his name, I imagine that there

20   would be a police officer who would get a photograph of him,

21   and it would be an older photograph.  So, I don't quite

22   understand why the State has its -- I'm sorry.

23            THE COURT:  No, I'm just trying to figure out

24   Mr. Shapiro -- I mean, there are many potential sources of

25   photographs of individuals, records of individuals.

1   Certainly, the -- you know, a police department, ABC Control,

2   any number of places where somebody's photograph may be.  I

3   don't know that turning to the State of California and saying:

4   Okay, let's see if they are anywhere in your records -- you're

5   talking about the sixth largest economy in the world.

6       You're talking about the -- you know, by the way, you're

7   talking about a judiciary that is larger than the judiciary of

8   Great Britain.  You're talking about a lot of people.  I guess

9   you're also talking about the most populous state in the

10  union, I assume, California is.

11      So, I'm not asking the State of California to go through

12  every agency, state and local, in an effort to try to find

13  some photograph that may very well exist.

14      If you have some reason to believe that they are located

15  in some, you know, police officer's -- police department's

16  file, maybe we'll take a look at that.  But I'm not going to

17  charge them with that responsibility.  It would take Counsel

18  here a lifetime, or close to it.  She'll be retired.

19          **MS. CRITCHFIELD:**  Hopefully.

20          **THE COURT:**  Probably happily so, in light of this

21  litigation.

22          **MS. CRITCHFIELD:**  Uh-huh.

23          **THE COURT:**  You know, I'm just not going to make them

24  do that.

25          **MR. SHAPIRO:**  Well --

1          **THE COURT:**  You know, it has to be very focused.  It

2   has to have some rationale why you think the Tiburon Police

3   Department may have a photograph or something like that, and

4   then we can get them to search their files, if it's of

5   significance.  If you have a justification for it.  But I'm

6   not going to require them to do it.

7      They told you, they're telling me, they have gone through

8   everything they have in the D.A.'s office or the office that

9   actually conducted the prosecution.  Right?

10          **MS. CRITCHFIELD:**  Correct.

11          **THE COURT:**  And it's not there.  Now, is it in the

12  San Mateo County -- is it in the San Mateo Police Department's

13  files?  I don't know.  I don't know.

14          **MR. SHAPIRO:**  Your Honor --

15          **THE COURT:**  Have to have a justification for it.

16          **MR. SHAPIRO:**  I asked for either -- really, for me,

17  either federal or state government, there are two places that

18  it's got to.  Number one, the Probation Office in the Northern

19  District of California supervised both those men.  At the

20  time.  Right?

21          **THE COURT:**  So, so make a very focused request.  I'll

22  have the department here look.

23          **MR. SHAPIRO:**  Thank you.  And I think that's where

24  we'd be, it will be --

25          **THE COURT:**  There we go.  So that will probably

1    answer the problem.

2        Let's go to No. 13:  The State shall produce all records,

3    reports, financial expenditures, claims for reimbursement for

4    any trips taken by Detective Singleton and/or Dirickson --

5    Dirickson?

6            **MR. SHAPIRO:**  Uh-huh.

7            **THE COURT:**  -- to southern California 1986 through

8    and including 1990, in connection with the Ewing on-the-side

9    investigation.

10       Okay.  So, that seems to me a very simple, focused thing.

11   I mean, either those financial records are maintained or

12   they're not.

13       Police officers are famous for seeking reimbursement for

14   their business travel.  And if you're telling me you looked

15   through the financial records of the agency -- which would be

16   the reimbursing agency, which I guess would be San Mateo

17   County Sheriff's Office or D.A.'s office.  And if they don't

18   exist, they don't exist.

19       I just need to know whether the request -- whether you did

20   the search and it's not there --

21           **MS. CRITCHFIELD:**  No, Your Honor.  Actually, I did

22   not do the search because we turned over everything we had

23   when the San Mateo County District Attorney's Office turned

24   over everything they had.

25       I at this point do not have an obligation under law to

```
 1    then go to the San Mateo County Sheriff's Department and get

 2    any other receipts.  I'm assuming, honestly, that if those

 3    receipts existed, they would have been in the District

 4    Attorney's file.

 5              THE COURT:  Why?

 6              MS. CRITCHFIELD:  Maybe not, but I don't have an

 7    obligation.  And I have a United States Supreme Court case

 8    (Indicating) that tells me --

 9              THE COURT:  Really.

10              MS. CRITCHFIELD:  -- post-conviction, there is no

11    Brady obligation on the part of the State to go pursue

12    additional avenues of inquiry.

13              MR. SHAPIRO:  Well, Your Honor, there is if

14    Your Honor orders it.  And, we're in a different context.  I'm

15    not sure which case she is talking about.  But --

16              THE COURT:  I doubt if it came up in this context.

17    I've never quite seen a case quite like this.

18              MR. SHAPIRO:  That's right.

19              THE COURT:  However, fine.  I'm ordering you to do

20    it, and we'll take it from there.

21         Okay.  That's a very easy -- it's a very easy search to

22    have conducted.  You simply go to the reimbursing agency,

23    whether it be the District Attorney's Office or the Sheriff's

24    Department, San Mateo County, and inquire of them do they have

25    records of reimbursements over this period of time for these
```

1    individuals.

2        Okay.  So, conduct the search.  Please conduct the search.

3    Thank you.

4        Okay.  That takes care of everything?

5            **MR. SHAPIRO:**  Yes, Your Honor.

6            **THE COURT:**  Okay.  Thank you very much.

7            **MR. SHAPIRO:**  Thank you.

8            **THE COURT:**  And I want to reschedule the hearing --

9    well, I don't know.

10       I'll leave it up to Mr. Shapiro.  Once he --

11           **MR. SHAPIRO:**  Right.

12           **THE COURT:**  Once he views the -- the responses, or

13   the response, we'll take it from there.  Thank you.

14           **MR. SHAPIRO:**  Thank you.

15           **MS. CRITCHFIELD:**   Thanks, Your Honor.

16       (Conclusion of Proceedings)

17

18

19

20

21

22

23

24

25

## **CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Thursday, March 12, 2015

Belle Ball, CSR 8785, CRR, RDR