Pages 1 - 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

```
RONALD McINTOSH,              )
                              )
          Petitioner,         )
                              )
   VS.                        )      NO. C 09-00750 CRB
                              )
ERIC HOLDER and ATTORNEY      )
GENERAL OF CALIFORNIA,        )
                              )
          Respondents.        )
_____)
```

San Francisco, California
Friday, September 11, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Petitioner:
                    BOERSCH SHAPIRO, LLP
                    1611 Telegraph Ave., Ste. 806
                    Oakland, CA 94612
              BY:   **DAVID WILLIAM SHAPIRO**
                    **ATTORNEY AT LAW**


For Respondent AG Eric Holder:
                    United States Attorney's Office
                    450 Golden Gate Avenue - 11th Floor
                    San Francisco, California  94102
              BY:   **DOUGLAS WILSON**
                    **WILSON LEUNG**
                    **ASSISTANT UNITED STATES ATTORNEYS**


For Respondent AG of State of California:
                    CA STATE ATTORNEY GENERAL'S OFFICE
                    455 Golden Gate Avenue - Room 11000
                    San Francisco, California  94102
              By:   **PAMELA K. CRITCHFIELD**
                    **ATTORNEY AT LAW**
Reported By:        Rhonda L. Aquilina, CSR #9956, RMR, CRR
                    Official Court Reporter

 1   **<u>Friday - September 11, 2015</u>**                    **<u>10:03 a.m.</u>**

 2                        **P R O C E E D I N G S**

 3                        **---oOo---**

 4        **THE CLERK:**  Calling civil Case No. 09-750, Ronald

 5   McIntosh versus Eric Holder, et al.

 6        Counsel, please step forward and state your appearances.

 7        **MR. SHAPIRO:**  Good morning, Your Honor.  David Shapiro

 8   for Mr. McIntosh.

 9        **THE COURT:**  Good morning.

10        **MR. WILSON:**  Good morning, Your Honor.  Doug Wilson,

11   and Wilson Leung on behalf of the United States.

12        **THE COURT:**  Good morning.

13        **MS. CRITCHFIELD:**  Good morning, Your Honor.  Pam

14   Critchfield on behalf of the State of California.

15        **THE COURT:**  All right.  Good morning.  So let's figure

16   out what we have to deal with today.  I don't know if we have

17   to do a protective order.  Has the government decided are you

18   appealing that, are you not appealing that, where do we stand

19   on that?

20        **MR. WILSON:**  Your Honor, we've reached agreement with

21   Petitioner for a revised protective order which I submitted to

22   you this morning.

23        **THE COURT:**  And that's this (indicating).  I mean, I

24   was just handed something.

25        **MR. WILSON:**  If you were just handed it, yes.  It's

```
 1   very similar to the one the Court entered with a few additional
 2   provisions.
 3            THE COURT:  And that's by stipulation or agreement
 4   or --
 5            MR. SHAPIRO:  It is, Your Honor.  It's -- it doesn't
 6   need to be filed under seal.  Mr. Wilson did it out of an
 7   abundance of caution.  The original one was not under seal.
 8   It's, instead of --
 9            THE COURT:  I don't really care whether you've filed
10   it under seal or not, but there is a signed one.  So it is what
11   it is.  I mean, you can deal with that as you wish.
12            MR. WILSON:  Okay.  It was received.
13            THE COURT:  If it was agreed to file it under seal,
14   file it under seal.  If they don't want to file it under
15   seal -- you know I'm not in favor of filing things under seal,
16   so, you know, it doesn't hurt anyone particularly.  If either
17   side wants it filed under seal, it will be filed under seal,
18   because that's what the agreement was, but if either side wants
19   it, it does not need to be filed under seal.
20            MR. SHAPIRO:  Right.  It wasn't -- the agreement
21   wasn't to seal it.
22            THE COURT:  Okay.  All right.
23            MR. SHAPIRO:  My agreement wasn't to seal it.
24            THE COURT:  Okay.  So that issue is over for the time
25   being.
```

 1          **MR. WILSON:**  Yes, Your Honor.

 2          **MR. SHAPIRO:**  For the time being.

 3          **MR. WILSON:**  And Mr. Shapiro will be reviewing the

 4   documents that are at issue in the protective order this

 5   morning.

 6          **THE COURT:**  Okay.  So I guess the question is -- well,

 7   there are a couple of questions sort of still outstanding.  One

 8   is was the -- is the present state of the declarations that

 9   have been filed in connection with the ongoing discovery

10   adequate, satisfactory, discharging the obligation of the

11   defendants to furnish further information about, as I

12   understand it, the non-existence or the non-location of

13   particular files; is that -- as I understand it, you can

14   correct me if I'm wrong, with this protective order in place,

15   the government has produced -- when I say the government, I

16   think we're talking about various entities, various defendants,

17   but they have produced that which they can now presently

18   locate.  Is there something else which they have located but

19   they haven't produced?  My understanding is there is not, but

20   am I wrong in that regard?

21          **MR. WILSON:**  That is our understanding, Your Honor,

22   that the government has produced everything responsive to

23   Mr. Shapiro's subpoena and to the Court's discovery order of

24   last January.

25          **THE COURT:**  So in other words, what you have is --

1    what you have produced is what you have.  What you have you

2    have produced.  And the remaining question that Mr. Shapiro

3    asked is, well, you haven't produced everything that in his

4    mind or his experience existed at one time, so I now want to

5    take depositions of people to find out whether what happened to

6    the documents that were in existence in my judgment to, one,

7    confirm that there was something in existence, and, two, find

8    out what happened to it.  Whether it was destroyed or whether

9    it simply --

10           **MR. SHAPIRO:**  But they didn't look hard enough.

11           **THE COURT:**  Well, or that they didn't conduct the

12   search, an adequate search.  And it just strikes me that that

13   is -- given what now has been produced, that without more, it

14   strikes me that -- I want to be fair in characterizing it.  I

15   don't want to call it a fishing expedition, but I want to call

16   it that it is a search for things that may have existed at one

17   time that don't seem to be there today, and under the passage

18   of time, we're talking about what, 20, 30 years?

19           **MS. CRITCHFIELD:**  Yes.

20           **THE COURT:**  The passage of time certainly would in

21   some manner account for its non-production.  I mean, that's

22   just what happens.  Files aren't necessarily, you know, just

23   kept in perpetuity.  This was all at a time that there weren't

24   digital files, that everything was paper, or perhaps tape

25   recorded and so forth, and files were discarded just in the

1  ordinary course of new people moving into an office and

2  cleaning out the Office of things that they aren't going to use

3  anymore or have any relation to.

4       So I'm just wondering -- you know, I think it's my

5  tentative view, and I'm going to go back and review this, and

6  I'll listen to anything anybody has to say, my tentative view

7  is make your motion, not on the discovery, make your motion on

8  the underlying case; and, you know, based upon all the

9  information you receive, and based on the fact I think that

10  there are certain things out there that you haven't received,

11  but you can point to, and I'll draw whatever inferences that

12  are appropriate to draw.  But I just think that requiring the

13  government to fly out, you know, any number of people to take

14  additional depositions is an extraordinarily expensive

15  proposition and time-consuming and a use of resources that

16  absent -- absent a real, solid justification for it doesn't

17  seem to me worthwhile.

18       Now, I'll listen to you, Mr. Shapiro, but I wanted to say

19  to you that you have the laboring oar here to try to convince

20  me that somehow your client is not getting a fair hearing if I

21  don't require any of these steps that you have suggested,

22  because I think that a lot of things have been turned over that

23  you knew exist, maybe not enough.

24       **MR. SHAPIRO:**  No, that's a misimpression, and let's

25  start with the federal government.  We can talk about the state

afterwards.

The state certainly has turned over a lot.  I'm not disputing that the state didn't turn over a lot of documents.

What I have gotten from now from these four federal agencies is virtually zero about Ronald Raiton, so I got 2,000 pages from the FBI about Ron McIntosh's escape case.  The FBI managed to save all those files about my client's escape case. They have produced nothing about Ronald Raiton's organization in Philadelphia.  He was a major witness in multiple cases. And I know, and the Court --

**THE COURT:**  But they're quite different, aren't they? I mean -- and let me just explain this to you.  An escape case, it does not surprise me that they have a lot of documents about the escape case.  That is X, it's an escape case.  Now what you're saying is, well, we got all that, they preserved all that, but they didn't preserve or you haven't seen the evidence of his, quote, cooperation, pre-escape; right?

**MR. SHAPIRO:**  No, no, no, I'm sorry.

**THE COURT:**  I mean, is that not right?

**MR. SHAPIRO:**  No, that's not what I'm saying.

What I'm saying is there is a case against McIntosh totally separate from his homicide case.  He flew a helicopter in and, quote-unquote, saved his girlfriend from Pleasanton. They made a movie about it.  That was a completely different case.  He was sitting in prison at the time he got charged for

the homicide.  Okay.  Ronald Raiton had nothing to do with that

case.  Ronald Raiton became really the only witness against him

in the homicide case, and he was allowed to come in and testify

about what this psychopath had said out of court.

So one of the things was --

**THE COURT:**  Chronologically where did that fit in with

the escape?

**MR. SHAPIRO:**  The escape was I think 1988.  The

trial -- or '87.  He was sitting in prison.  He gets charged.

He went to trial in 1990, and he was convicted.

**THE COURT:**  And you have the papers from all of that.

**MR. SHAPIRO:**  I have the state papers.

So Ronald Raiton was the main witness.  There is virtually

nothing in the state documents.  There isn't even a rap sheet

for Ronald Raiton in the state documents that I got from the

state.  So I said, well, FBI, turn over the 302s and the

historical reports about Raiton's involvement in the

methamphetamine distribution business in Philadelphia and all

your associates.  It has nothing with him being an informant or

not an informant, he was a witness; right?  They never produced

it before the trial, and that's what I subpoenaed now.

And I cannot believe that the FBI destroyed it.  They

don't destroy that stuff.  And as I pointed out in my reply,

they didn't even look in the index that applies to older cases.

They looked in a current index that the attorney for the FBI

said, well, it's outdated anyway.

So it doesn't make any sense that you would have a relatively minor case maybe, you know, TV worthy escape case, and then this mafia case:  Oh, we destroyed it all.  But they don't even say what happened to all those 302s.  That's just the FBI.

And then, on top of that, they redacted things they gave me under FOIA.  That's utterly ridiculous.  So that's just the FBI, and that doesn't make any sense, and that's why Ms. Porcelli, or Porcelli's declaration that purports to sort of outline what she did, it's not complete.

Now, maybe I don't have to have a deposition, but I don't know how I get to yes, there used to be 302s about Ronald Raiton and his P2P and methamphetamine organization and the Scarfo crime family, we destroyed those in -- tell me what year.  That's what I want to know.

**THE COURT:**  Okay.  So what -- Mr. Wilson, go ahead.

**MR. WILSON:**  Well, Your Honor, all I can say is that the FBI has bent over backwards to try to find documents responsive to Mr. Shapiro's subpoenas, and they have not found anything.

I cannot -- I didn't conduct the search, Mr. Leung didn't conduct the search, the FBI conducted the search, and we don't actually know everything that they've looked for, but they have tried very hard to comply with the subpoenas.

1    **THE COURT:**  Okay.  But what Mr. Shapiro says is that

2    to the best of his knowledge, based upon his experience, which

3    is not so different from your experience, the FBI, one, would

4    not have destroyed these files, and two, that according to the

5    information he has received in terms of the scope of the

6    search, that it seems to be either inadequate or wrong headed

7    or so forth.

8    I mean, I might want to try to put this thing to rest.

9    I'm sure you do too, everybody does, and I do not want to do

10   depositions.  And it just seems to me -- I don't quite know how

11   to get to it.  I do need to resolve the issue as to whether or

12   not -- as to the scope of the search conducted by the FBI.  You

13   know, I need to -- I'm not saying we have to find documents

14   that have been discarded, you know, and so forth.  I am saying

15   that at least you have to look in the places that traditionally

16   these documents would be found.

17   And I sort of turn to you, Mr. Wilson, because,

18   number one, I have great respect for you, and number two, you

19   don't want to prolong this anymore than anybody else wants to

20   prolong it.  So I think that through your contacts, you can

21   satisfy, at least satisfy yourself, and then you can tell

22   Mr. Shapiro, and if necessary the Court, what happened in this

23   case.  That is to say, what was the scope of the search, and

24   two, if there is something that it can be produced under a

25   protective order, and if there isn't, why there isn't, and I

don't think you have answers to those questions standing in

front of me today.

    **MR. WILSON:**  Well, Your Honor, and I do not have

complete answers.  But I also think that, with all due respect,

the Court is going a little further than the Court usually

does.  In a *Brady* case, for example, we turn to the FBI, and we

say we need all the *Brady* material, and the FBI conducts its on

search.  We don't ask the FBI what it searched.  We don't ask

the FBI to search in particular places.  They are responsible

for coming up with responsive material.

    **THE COURT:**  But at least I want a definition from them

as to how they conducted the search.  I'm not going to tell

them how to conduct the search.  I'm not going to have them

deposed as to how they conduct the search.  But an individual

who is asked, when you ask them, we need all the X materials,

and he writes back there are no documents in response to your

request, I want him to say:  I went to the place where the X

materials in the normal course of business would be kept for

this period of time, and so forth, and found no documents.

Something like that.

    You know, I mean, listen, everybody is busy in this -- you

know, but I do need to address that particular issue so that we

can get on with the question of whether or not relief in this

case should be granted.  That's the ultimate question.  And the

government certainly takes the position that it ought not to

 1   be, and yet the case goes on and on.

 2        You know, look, I may be guilty of, quote, prolonging it,

 3   but I want to satisfy myself that whatever information -- I

 4   don't -- I'm not so interested in why information isn't there,

 5   because I just think over the passage of time these things

 6   happen.  But I want to be satisfied that the traditional ways

 7   of looking for the information were followed in this particular

 8   case.  I think there's a presumption they were, I understand

 9   that.  But on the other hand, I think that counsel has raised

10   some questions which he is entitled to have some responses.

11   And when he goes in and he says, well, they went and they

12   looked at the file that one wouldn't expect a closed case, I

13   guess that's what you're saying, Mr. Shapiro, closed case to

14   have the files be sought would be located.

15        You know, I was not in the FBI, I wasn't even in the U.S.

16   Attorneys' Office, you know, but I'm looking to people who all

17   were in the U.S. Attorneys' Office, and still are.  And so, you

18   know, it's like asking you, well, you look in your office, you

19   know, this isn't your office, it's the FBI's office, but you

20   know how these things work.

21        So I would love to see -- and maybe the line of

22   communication ought to be between the two of you to see whether

23   or not you can get that type of declaration from the custodian

24   of records.  That seems to be fairly straight forward.

25        **MR. WILSON:**  So just to be clear, Your Honor, the

1  Court believes that between Mr. Shapiro and I, or file, we

2  should produce a declaration from the FBI and personnel people

3  or personal personnel who conducted the search that details the

4  extent of the search.

5      **THE COURT:**  But I want to augment that, because

6  Mr. Shapiro has pointed out that the place where the individual

7  from the FBI searched is in his opinion not the place that one

8  would find the records, necessarily find the records.  It could

9  have been, but not necessarily.  So I think I'd like to augment

10  it by Mr. Shapiro's suggesting to you that this agent or

11  custodian should look at X, Y, or Z, and if that's appropriate,

12  that is, it's the sort of thing that this custodian would have

13  access to or a custodian in the Federal Bureau of Investigation

14  have access to, then do it, then do it.

15      **MR. SHAPIRO:**  Yes.  I'm sorry.  Did I interrupt?

16      **THE COURT:**  No, no, not really.  I'm just trying --

17  you know, this is like a discovery session.  I mean, I don't

18  even do this thing routinely, and maybe this points out why I

19  shouldn't, but --

20      **MR. SHAPIRO:**  Your Honor, if we can have a discussion,

21  we meaning Mr. Wilson and me can have a discussion...

22      **THE COURT:**  You've met each other.

23      **MR. SHAPIRO:**  Yeah, we know each other.  Yes, we know

24  each other.

25      **THE COURT:**  Okay.  Okay.

1        **MR. SHAPIRO:**  And talk about what it is that they

2    looked for, why it doesn't exist, what happened to it, when it

3    was destroyed, all those things, and he can understand what I'm

4    looking for, and maybe I could even have on the phone

5    Ms. Porcelli, who was the one who was the lead internal FBI

6    lawyer who was looking for documents, although she evidently --

7        **THE COURT:**  Well, I must say, I want the government to

8    conduct -- I mean, I don't want to start putting these people

9    on the phone.  I don't want to start having depositions.  I

10    trust Mr. Wilson when he -- you know, as long as the two of you

11    are communicating, and it's clear what you are saying to one

12    another, then I turn it over to Mr. Wilson to discuss things

13    with the FBI.  Mr. Wilson -- if Mr. Wilson knows or has reason

14    to believe of the existence of a document that's going to be

15    required, he'll give it to you.  He'll find it.  He's not going

16    to cover it up, and so I'm perfectly satisfied with a person

17    who you aren't going to speak to.

18        So what I'm directing you to do is to go to the Charles R.

19    Breyer attorneys lounge now on the 18th floor, get a cup of

20    coffee, and sit down and have a discussion, okay, and then just

21    tell me if you need me to do anything.

22        **MR. SHAPIRO:**  That -- I would like that to apply to

23    the ATF as well as to the U.S. Marshal's Service.

24        **THE COURT:**  Well, whatever, whatever.  The ATF, I

25    don't know, do you have any interaction with the ATF on this

1    case?

2        **MR. WILSON:**  I have not had any -- I mean, the ATF

3    supplied, I believe, 350 documents, pages of documents.

4        **THE COURT:**  Well, but I mean are you the person who

5    deals with the ATF?

6        **MR. WILSON:**  I have not dealt with them until -- I

7    have not dealt with the ATF or the Marshal's Service Office.

8    Mr. Leung has been the --

9        **THE COURT:**  Well, who is the person that you deal with

10   at the ATF?

11       **MR. SHAPIRO:**  I was speaking to a man by the name of

12   Barry Orlow, who was a lawyer or is for the ATF.

13       **THE COURT:**  Can you talk to him?

14       **MR. SHAPIRO:**  But then Mr. Leung became involved in

15   that.

16       **THE COURT:**  Well, whoever is going to deal with the

17   ATF, I actually think it's better if the United States Attorney

18   deals with this, so we have sort of one interlocutory for all

19   these agents of the federal government, but that's up to you.

20   I can't -- Their your clients.  You have them.

21       **MR. WILSON:**  Your Honor, Mr. Shapiro, at least in his

22   view, has made a showing that the FBI hasn't conducted a

23   thorough search.  I don't think any showing has been made as to

24   the ATF and U.S. Marshals' Service.

25       **THE COURT:**  Have a discussion, have a discussion to

1   see where your points of agreement and disagreement are, but

2   let's try to move it forward with respect to what you can do;

3   okay?

4        **MR. SHAPIRO:**  I have a discussion ongoing with the DEA

5   lawyer.

6        **THE COURT:**  Well, then you can continue discussions.

7     Okay.  Now, the state --

8        **MR. SHAPIRO:**  Well, can I just -- couple other things

9   on the federal subpoena.  I got redacted documents.  Those

10  redactions were improper under the law, under FOIA.

11       **THE COURT:**  I'm a little concerned about the

12  redactions, what would be the relevant -- why would anything

13  be -- given a protective order that's in place, where I think

14  probably more sensitive information is being disclosed than

15  that which is redacted necessarily, I don't know, but can you

16  go back and revisit the redactions and see whether or not it's

17  necessary to redact?

18       **MR. WILSON:**  We're happy to look at them.  We've tried

19  to redact some personal information and some FBI --

20       **THE COURT:**  Why don't you take a look at it?

21       **MR. SHAPIRO:**  This was in the FBI, they claimed FOIA

22  exceptions, and the ATF claimed tax returns exceptions.

23       **THE COURT:**  Okay.  What's next?

24       **MR. SHAPIRO:**  If I may, Your Honor, the other point

25  with respect to the federal subpoenas is so there are these 174

1    pages I've got to go look at, and I don't know what I received.

2    The government has told me they're completely irrelevant.

3        **THE COURT:**  Mr. Shapiro, you're not -- please don't

4    discuss 174 pages, nothing about the 174.  You look at them --

5        **MR. SHAPIRO:**  Right.

6        **THE COURT:**  -- and then if you have something to say

7    about them, you can say something about them.

8        **MR. SHAPIRO:**  But all I'm asking for is to be able to

9    schedule something, so I don't have to file another motion to

10   come back before Your Honor.

11       **THE COURT:**  You're not scheduling anything.  You're

12   going to sit down and talk to Mr. Wilson.  He's your new best

13   friend.

14       **MR. SHAPIRO:**  Well, here's the reason why I can't

15   discuss them under our agreement.

16       **THE COURT:**  You can discuss them with Mr. Wilson.

17       **MR. SHAPIRO:**  I can't discuss them with my client or

18   my investigator.

19       **THE COURT:**  Right.

20       **MR. SHAPIRO:**  So then I want to say to Your Honor

21   these things are not what the government said they are

22   relevant.

23       **THE COURT:**  I don't know.

24       **MR. SHAPIRO:**  I know, and that's --

25       **THE COURT:**  And that's what I thought you actually

1  weren't going to get into a discussion about the 174 pages you

2  have yet to see.

3      **MR. SHAPIRO:**  Right.  But all I'm asking for is

4  another control date.

5      **THE COURT:**  No, I'm not giving any control dates.  A

6  control date is my lifetime for good behavior.  Okay.  Now

7  turning to -- that's a control date.

8      Now turning to the state.  Yes.  Where are we on the

9  state, which has been very forthcoming.

10     **MR. SHAPIRO:**  The problem with the state production is

11 we got to the point where there were virtually no interview

12 memos.  The police said they documented every possible

13 interview, so Your Honor ordered the Sheriff's Office to

14 produce their records.  I got 21 largely irrelevant transcripts

15 of interviews, that's it.

16     So I don't have -- it's the same problem as with the

17 federal agencies.  I don't have any answers to well, what

18 happened to all these things that people talked about?  I don't

19 disagree with you that maybe somebody decided to throw

20 everything away, but somebody should be able to say, yeah, we

21 threw them all away.

22     **THE COURT:**  Not necessarily.  I mean, as a former DA,

23 I can tell you exactly what happened when I would move office

24 to office.  And what happens is, at least it was the practice

25 then, maybe not the practice now, but it was the practice then

frequently you'd look and you see boxes and you say to somebody, *Well, what were these?* He says, *Well, those are my case notes in a case that* -- you know, the Boston strangler or something, or some case that he had. They say, *Well, get rid of it. Take it with you.* They say, *No, no, I don't want it. Just throw it out.* That's what happens. Well, it may be terrible, maybe we shouldn't do it, but I'm just saying that -- and how would anybody know? In other words, how would anybody know that I moved into Room 326 which was inherited from another deputy who was trying a case ten years before, and I look around and see these boxes and start throwing them out. The old deputy wouldn't know it, and the new deputy would have no recollection -- would have no idea what was in these files, and then it would pass deputy to deputy to deputy.

I'm just telling you that that's the practical -- that's what happens. Now, maybe it didn't happen in this case. I don't know. Maybe -- is it San Mateo County?

**MS. CRITCHFIELD:** Yes.

**MR. SHAPIRO:** It's the Sheriff's Office we're talking about.

**MS. CRITCHFIELD:** And the District Attorney's Office.

**THE COURT:** So maybe they work differently, but I don't -- I would be surprised.

**MR. SHAPIRO:** But that may be true, and I'm not disputing it, but nobody has said this is -- we have no idea

1  when they got destroyed or they would have been destroyed in

2  about 2000.

3        **THE COURT:**  But they don't know.

4        **MR. SHAPIRO:**  But that's what Your Honor is saying.

5  That doesn't -- I want them to say that.

6        **THE COURT:**  Okay.

7        **MS. CRITCHFIELD:**  I have declarations from the Chief

8  Deputy District Attorney in San Mateo and the records custodian

9  of the San Mateo County Sheriff's Office saying we have

10  produced everything we have.

11        **THE COURT:**  Well, that's not what his point is.  His

12  point is -- his point is he's not saying you're holding on to

13  something.  He's saying --

14        **MR. WILSON:**  Well, actually, he did say that in his

15  papers, Your Honor, but --

16        **THE COURT:**  Well, okay, but you're not.

17        **MR. WILSON:**  Thank you.  I'm not.

18        **THE COURT:**  Okay.  So the question is what happened to

19  documents that logically would have existed at some point and

20  now aren't located, and he's saying he has no declaration of

21  the fact that as to the disappearances of the documents, and

22  the problem is -- your point is, well, nobody really knows what

23  happened.

24        **MS. CRITCHFIELD:**  True.

25        **THE COURT:**  Because -- and I could certainly accept

that.  I mean, I just think that that's the case.  It happens.

I don't know who does a declaration.  I mean, like I could do a

declaration saying well, you know, let's see, I was in about

five different offices at 850 Bryant Street, or maybe ten over

a period of five years, and whenever I went into an office, I

don't know what I did, but it's entirely possible that I could

have taken a box and put it in the trash.  I mean, that's the

truth, but I couldn't tell you that was my habit and custom.  I

couldn't tell you I did it in any particular case.  I couldn't

even tell you what offices I was in, except one that I liked

because it was near the door and I could get out without

anybody seeing me, so I liked that one.  But other than that, I

have no idea.  I mean, that's just the way it is.

     And I think that, you know, I just think that it's going

to be too -- look, if it could be done, if somebody could say

it, that's fine, in that office, but I don't know who it would

be.

          **MS. CRITCHFIELD:**  I'm not sure either.  The person

that I have contact with or that is in charge in San Mateo is

the Chief Deputy.  She has verified virtually everything she's

given me, everything.  I'm not sure what she would represent as

to what was destroyed, when it was destroyed, how it was

destroyed.  I mean, I suppose we could have her sign a

declaration that says I don't know anything or, oh, yes, it was

thrown out in 1992.  I think that they've given everything they

```
 1  have at this point.

 2      And I would like to interject one point, and that is

 3  Mr. Shapiro has said over and over that there are no -- there

 4  were no interviews.  In reality, I did a very quick search of

 5  the discovery that we have provided to him and found 60

 6  interviews in those records, so in fact there are many

 7  interviews that have been turned over.

 8      THE COURT:  Well, I think the way to deal with this is

 9  to see the motion.  I mean, I think we're -- once the FBI has

10  complied with these requests, and once Mr. Shapiro has viewed

11  the 174 pages, then I think we should move on to see what the

12  motion is going to look like.

13      MR. SHAPIRO:  I will do that, Your Honor.  But as

14  Ms. Critchfield was just talking, she said maybe Ms. Guidotti

15  could say this, that, or the other thing.  That's what I want.

16  That's what I asked for.  I said, what happened to it?

17      THE COURT:  Yeah, but the problem is, the problem is

18  she doesn't know.  I mean, I take that representation.  I mean,

19  I guess she could file a declaration saying I don't know what

20  happened to them, and if that would satisfy you, which it

21  wouldn't.

22      MS. CRITCHFIELD:  It wouldn't.

23      MR. SHAPIRO:  It would be better than nothing.  I have

24  nothing.

25      THE COURT:  Pardon?
```

1          **MR. SHAPIRO:**  I have nothing now.  I just have *we gave*

2   *you what you got*.

3          **THE COURT:**  But you have the statements -- look, you

4   have what -- I don't know if she was there at the time and had

5   some interaction with it --

6          **MS. CRITCHFIELD:**  No, she didn't.

7          **THE COURT:**  -- fine, but she wasn't.  So then your

8   next question, well, of course she wasn't there, so it's not

9   really a very useful declaration, which I agree with you, it's

10  not a useful declaration.  So you say, well, what I need to do

11  is find who was there.  Well, assuming somebody is still

12  living, that they were there, you could locate them, that's

13  what it turns into.  And I'm not going to -- I'm just not going

14  to go through this, you know, great historical inquiry as to

15  what happened to these documents, because I think a certain

16  amount of common sense kicks in, and I'd like to see your

17  motion, that's what I'd like to see.  It's either we'll see

18  what it says, and then we'll take it from there.

19       So Thank you.  Go off, and there's your protective order.

20         **MR. SHAPIRO:**  Thank you.

21         **THE COURT:**  And I'm sure I'll see you soon, please,

22  within the control date that I've given you.

23              (Proceedings adjourned at 10:35 a.m.)

24                        ---oOo---

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Tuesday, September 22, 2015

8

9

10

11    _____

12    Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
              Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25