BOERSCH SHAPIRO LLP
David W. Shapiro (State Bar No. 219265)
Dshapiro@boerschshapiro.com
1611 Telegraph Ave., Ste. 806
Oakland, CA 94612
Telephone: (415) 500-6640

Ted Sampsell-Jones (MN State Bar No. 034302X)
*Not admitted in California
William Mitchell College of Law
875 Summit Avenue
St. Paul, MN 55105
Telephone: (651) 290-6348
Ted.sampselljones@wmitchell.edu

Attorney for Petitioner
RONALD J. MCINTOSH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

RONALD J. MCINTOSH,

        Petitioner,

    v.

ERIC H. HOLDER and ATTORNEY
GENERAL OF CALIFORNIA,

        Respondents.

Case No. C 09-00750 CRB

**FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS**

# TABLE OF CONTENTS

NOTICE OF MOTION ..................................................................................................1

INTRODUCTION........................................................................................................1

FACTUAL BACKGROUND .......................................................................................2

    I.  The Murder of Ronald Ewing........................................................................2

        A.  The Defendant's Business .............................................................2

        B.  Ronald Ewing's Murder ...............................................................3

    II.  Younge's Testimony and the State's Case Against McIntosh ..........................4

        A.  The Joint Investigation ..................................................................4

        B.  Younge's Trial Testimony .............................................................4

        C.  Chandler's Testimony and Other Evidence ...................................6

        D.  Conviction and Appeal..................................................................6

    III.  Exculpatory Evidence Withheld by the State ................................................7

PROCEDURAL HISTORY – HABEAS PROCEEDINGS AND DISCOVERY .........8

    I.  Initiation of Habeas Proceedings ..................................................................8

    II.  Discovery Motions .......................................................................................10

    III.  Revelations from the State's Disclosures ...................................................11

        A.  The Police Intimidation of McIntosh's Alibi Witness ...................11

        B.  The Suppression of Quartermain's Psychosis and Schizophrenia .........12

        C.  The Younge Perjury ......................................................................12

        D.  The State's Coaching of Chandler ................................................13

    IV.  Revelations from the Federal Disclosures ...................................................14

ARGUMENT ...............................................................................................................16

    I.  MCINTOSH'S HABEAS PETITION IS TIMELY .......................................16

        A.  McIntosh Complied with the Federal Statute of Limitations................17

    II.  THE DISTRICT COURT REVIEWS CONSTITUTIONAL VIOLATIONS DE NOVO WHEN THE STATE COURTS DENIED THE CLAIMS ON PROCEDURAL GROUNDS ...................................................................................................21

    III.  A PETITIONER MAY RELY ON FACTS NOT CONSIDERED BY STATE COURTS WHEN THE STATE HABEAS PETITION WAS DENIED ON PROCEDURAL GROUNDS ...................................................................................................22

    IV.  THE STATE VIOLATED *BRADY* AND *GIGLIO* ......................................22

    V.  THE STATE VIOLATED *MOONEY-NAPUE*..............................................25

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

VI.  THE STATE INTERFERED WITH MCINTOSH'S ABILITY TO PRESENT HIS OWN
WITNESS  ...........................................................................................................26

**CONCLUSION** ........................................................................................**27**

# TABLE OF AUTHORITIES

**Cases**

*Banks v. Dretke,*
  540 U.S. 668 (2004) ...................................................................................18, 19, 23

*Brady v. Maryland,*
  373 U.S. 83 (1963) ..................................................................................................22

*Carriger v. Stewart,*
  132 F.3d 463 (9th Cir. 1997) ................................................................................20

*Coleman v. Thompson,*
  501 U.S. 722 (1991) ...............................................................................................18

*Com. of N. Mariana Islands v. Bowie,*
  236 F.3d 1083 (9th Cir. 2001) .......................................................................24, 26

*Cone v. Bell,*
  556 U.S. 449 (2009) ...............................................................................................23

*Cullen v. Pinholster,*
  131 S. Ct. 1388 (2011) ...........................................................................................22

*Davis v. Ayala,*
  135 S. Ct. 2187 (2015) ...........................................................................................22

*Dow v. Virga,*
  729 F.3d 1041 (9th Cir. 2013) ..............................................................................25

*Earp v. Ornoski,*
  431 F.3d 1158 (9th Cir. 2005) ..............................................................................26

*Ford v. Gonzalez,*
  683 F.3d 1230 (9th Cir.) .........................................................................................18

*Frost v. Gilbert,*
  No. 11-35114, 2016 WL 1085228 (9th Cir. Mar. 21, 2016) ...........................18

*Giglio v. United States,*
  405 U.S. 150 (1972) ...............................................................................................23

*Holland v. Florida,*
  560 U.S. 631 (2010) ...............................................................................................18

*Horton v. Mayle,*
  408 F.3d 570 (9th Cir. 2005) ................................................................................19

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

*In re Robbins,*
   18 Cal.4th 770.................................................................................................................9

*James v. Ryan,*
   733 F.3d 911 (9th Cir. 2013)...................................................................................22

*King v. Trujillo,*
   638 F.3d 726 (9th Cir. 2011)...................................................................................21

*Kyles v. Whitley,*
   514 U.S. 419 (1995)................................................................................................23

*Kyles v. Whitley,* 514 U.S. 419, 437–38 (1995).........................................................19, 23, 24

*Larsen v. Soto,*
   742 F.3d 1083 (9th Cir. 2013).................................................................................20

*McQuiggin v. Perkins,*
   133 S. Ct. 1924 (2013)............................................................................................20

*Milke v. Ryan,*
   711 F.3d 998 (9th Cir. 2013)...................................................................................24

*Miller v. Pate,*
   386 U.S. 1 (1967)....................................................................................................26

*Mooney v. Holohan,*
   294 U.S. 103 (1935)................................................................................................25

*Napue v. Illinois,*
   360 U.S. 264 (1959).....................................................................................20, 25, 26

*Pace v. DiGuglielmo,*
   544 U.S. 408 (2005)................................................................................................17

*People v. Quartermain,*
   16 Cal. 4th 600 (1997)............................................................................................13

*Quezada v. Scribner,*
   2011 WL 3652245 (C.D. Cal. Aug. 19, 2011) .......................................................22

*Quezada v. Scribner,*
   611 F.3d 1165 (9th Cir. 2010).................................................................................18

*Rhines v. Weber,*
   544 U.S. 269 (2005)................................................................................................17

*Rose v. Lundy,*
   455 U.S. 509 (1982)..................................................................................................9

iv

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

*Rudin v. Myles*,
  781 F.3d 1043 (9th Cir. 2015) ................................................................18

*Sawyer v. Whitley*,
  505 U.S. 333 (1992) ................................................................21

*Schlup v. Delo*,
  513 U.S. 298 (1995) ................................................................9, 20, 21

*Shelton v. Marshall*,
  796 F.3d 1075 (9th Cir.) ................................................................23

*State v. Allen*,
  No. 03C01-9708-CC-00367, 1999 WL 5173 (Tenn. Crim. App. Jan. 8, 1999) ................24

*State v. Hunt*,
  615 N.W.2d 294 (Minn. 2000) ................................................................24

*Strickler v. Greene*,
  527 U.S. 263 (1999) ................................................................18, 19, 23

*United States v. Chapman*,
  524 F.3d 1073 (9th Cir. 2008) ................................................................11

*United States v. Jennings*,
  960 F.2d 1488 (9th Cir. 1992) ................................................................23

*United States v. Pungitore*,
  910 F.2d 1084 (3d Cir. 1990) ................................................................13

*United States v. Quatermain*,
  613 F.2d 38 (3rd Cir. 1980) ................................................................16

*United States v. Vavages*,
  151 F.3d 1185 (9th Cir. 1998) ................................................................20, 26

*Wainwright v. Sykes*,
  433 U.S. 72 (1977) ................................................................18

*Walker v. Martin*,
  562 U.S. 307 (2011) ................................................................10, 18

*Washington v. Texas*,
  388 U.S. 14 (1967) ................................................................26

*Wearry v. Cain*,
  136 S.Ct. 1002 (2016) ................................................................23

v

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

*Wilson v. Beard*,
   No. CIV.A. 05-2667, 2006 WL 2346277 (E.D. Pa. Aug. 9, 2006) ...................................................24

**Statutes**

28 U.S.C § 2244(d)(1) .........................................................................................................................17

28 U.S.C. § 2244(d)(2) ........................................................................................................................17

28 U.S.C. § 2254(d) .............................................................................................................................21

28 U.S.C. § 2254(e)(1) .........................................................................................................................22

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

**NOTICE OF MOTION**

Pursuant to Sections 2241, 2243, and 2254 of Title 18, United States Code, and Rule 60 of the Federal Rules of Civil Procedure, and upon all prior proceedings and pleadings had herein, Ronald McIntosh will move this Court, on **June 17, 2016, at 10:00 a.m.**, before the Honorable Charles R. Breyer, in the United States Courthouse, Courtroom 6, 450 Golden Gate Ave., 17th floor, San Francisco, CA, for an order relieving him of the Court's order denying McIntosh's petition for a writ of habeas corpus, granting him summary judgment, and issuing a writ of habeas corpus ordering McIntosh released from custody.

**INTRODUCTION**

On May 8, 1984, Drax Quartermain shot and killed Ronald Ewing near a beach in Pacifica. Petitioner-defendant Ronald McIntosh was not present at the killing, but years later, he was convicted of conspiracy to commit the murder. The State alleged that McIntosh had hired Quartermain to kill Ewing because McIntosh and Ewing had a dispute over money. Quartermain himself did not testify at McIntosh's state court trial. Rather, the conviction rested primarily on the testimony of David Younge. Younge testified, for example, that Quartermain told him that McIntosh had hired Quartermain to kill Ewing. The State's case was thus based largely on hearsay evidence, along with other circumstantial evidence that the State claimed corroborated Younge's testimony.

The jury convicted McIntosh, and he was sentenced to a term of life without the possibility of parole. The California Court of Appeal affirmed the conviction.

Years later, however, new evidence emerged that undermined much of the State's case. The State and federal government withheld evidence about Quartermain's criminal past and psychological history, and also about Younge's criminal past and his relationship with Quartermain. The government pressured a key defense alibi witness, who thus declined to cooperate with the defense or testify at McIntosh's trial. The government also coached another prosecution witness' testimony, essentially instructing her to invent a story that would later turn out to provide critical corroboration for the State's case.

1                    FRCP 60 MOTION AND RENEWED
                     PETITION FOR A WRIT OF HABEAS
                                CORPUS
                     Case No.: C 09-00750 CRB

1   The new evidence led to the initiation of this federal habeas petition, through which

2   McIntosh sought additional discovery and also relief from his invalid conviction based on *Brady*

3   and other constitutional violations.  Throughout these proceedings, the State and federal

4   government have stonewalled, repeatedly flouting this Court's orders to cooperate in providing

5   whatever additional *Brady* material they might have in their possession.  It is impossible to know

6   what other evidence may still remain hidden.

7   Regardless, the present record contains enough new evidence to thoroughly undermine the

8   confidence in the verdict.  This evidence was illegally withheld by the government in violation of

9   McIntosh's constitutional rights.  He is entitled to a new trial.

## FACTUAL BACKGROUND

**I.   The Murder of Ronald Ewing**

12   It is undisputed that Quartermain killed Ewing.  Many of the background facts leading up to

13   the murder are also undisputed.

### A.  The Defendant's Business

15   In October 1983, McIntosh and Michael Anthony created a company named FITC in Marin

16   County to buy and sell gold, silver, and other contracts for investment.  McIntosh and Anthony

17   previously met in federal prison, where both had served sentences for fraud.  Because of that prior

18   misconduct, they sought a low profile in running FITC.  The company ran afoul of securities

19   regulations in a variety of ways.

20   Anthony and McIntosh had a business arrangement with Ronald Ewing.  Ewing and Anthony

21   were friends and drug-buddies—the trial record was replete with evidence of their partying and

22   copious cocaine usage.  Ewing arranged a new lease for FITC's headquarters in exchange for a

23   percentage of sales revenues.  But the agreement was apparently not clear, and within a short time,

24   Ewing had a dispute with Anthony and McIntosh about how much he was owed.  At some point, he

25   made threats to expose the FITC's business as fraudulent to the Wall St. Journal.  McIntosh testified

26   at trial and admitted that there had been disagreements with Ewing, but he said that they still retained

27   a good relationship—they still worked together, and Ewing and Anthony still partied frequently.

28                                     2         FRCP 60 MOTION AND RENEWED
                                                 PETITION FOR A WRIT OF HABEAS
                                                 CORPUS
                                                 Case No.: C 09-00750 CRB

1    In January 1984, a mutual acquaintance introduced Anthony and McIntosh to her friends,

2    Quartermain and Younge at a restaurant.[1]  Younge and Quartermain took an interest in FITC, and

3    they offered to provide various services in exchange for compensation.  For example, Quartermain

4    and Younge told McIntosh and Anthony that they could help FITC buy gold overseas and move

5    money around the world.  Younge claimed that he had previous experience working with offshore

6    banks, and it could help FITC.  McIntosh rejected the offer, but Quartermain and Younge persisted

7    and subsequently contacted FITC later looking for other business arrangements.

8    ### B.  Ronald Ewing's Murder

9    On the night of May 7 and the early morning of May 8, 1984, Anthony and Ewing were

10   together partying.  Eventually, they drove to a Denny's restaurant near Pacifica, apparently because

11   Anthony told Ewing they could buy cocaine there from Quartermain.  Quartermain arrived at the

12   Denny's, along with a friend and accomplice, Deborah Chandler.  All of them then left Denny's and

13   drove to a turnout near Montara State Beach, with Anthony and Ewing in one car and Quartermain

14   and Chandler in another.

15   Of those present at the killing, Chandler was the only one who testified at McIntosh's trial.

16   She said that when they arrived at the turnout, Quartermain got out of the car.  She then heard three

17   gunshots.  She saw a man, Ewing, struggling and heard him asking for help.  Quartermain got back in

18   her car and they sped off.

19   Ewing's body was found by a passerby on Montara State Beach several hours later, at about

20   9:00 a.m.  The body had been stripped and apparently placed in the water, but it washed up on the

21   beach.

22   //

23   //

24

---

25   [1] "Quartermain" and "Younge," it turned out, were aliases.  Both men had extensive criminal

26   backgrounds and Mafia connections. Quartermain had been renamed (to Drax Quatermain) and

27   relocated by the Witness Security Program; Younge was renamed by the FBI and, while approved for participation in WitSec, declined entry into the program. For the sake of simplicity, petitioner refers to them as Quartermain and Younge.

28

FRCP 60 MOTION AND RENEWED
                                                                 PETITION FOR A WRIT OF HABEAS
                                                                 CORPUS
                                                                 Case No.: C 09-00750 CRB

## II.   Younge's Testimony and The State's Case Against McIntosh

### A.  *The Joint Investigation*

Ewing's murder went unsolved for several years.  In the meantime, McIntosh was convicted and sentenced to federal prison for securities fraud.  McIntosh was furloughed in October 1986, but while in prison, he had fallen in love with a female inmate, Samantha Lopez.  In a November, in a made-for-TV twist, McIntosh stole a helicopter and flew it into the prison yard, where he picked up Lopez and escaped.  The ensuing investigation involved cooperation between the FBI and California state authorities.

In part as a result of that incident, the Ewing investigators, FBI, and US Marshal Service worked together on the Ewing homicide.  In October or November 1986, the police talked to the FBI about their desire to find someone named "Drax."  The FBI then told the police that its star witness in the Philadelphia Mafia cases – David Younge – had a criminal associate named Drax Quartermain.  On June 24, 1987, the police interviewed Younge about his knowledge of the Ewing homicide.

Younge told a story in which he effectively exonerated himself for any involvement in the killing, but incriminated Quartermain, Anthony, and McIntosh.  His story ultimately led to the arrests and convictions of all three other men, and he was the star witness at McIntosh's 1990 criminal trial.

### B.  *Younge's Trial Testimony*

Quartermain did not testify at McIntosh's trial, but Younge did.  According to Younge, Quartermain admitted to him that he'd killed Ewing, and he told Younge he'd committed the murder because Anthony and McIntosh had offered him $55,000 to do so.

Younge testified that he and Quartermain met Anthony and McIntosh, and that shortly thereafter, they sought to find a way to do business with FITC.  Younge and Quartermain believed that they had services to offer FITC and sought to be retained.  Although McIntosh rebuffed them, they persisted, and Quartermain went to a meeting at FITC to talk business.  Younge did not attend, but according to Younge, Quartermain told him that at the meeting, Anthony or McIntosh asked about buying a silencer from him.

FRCP 60 MOTION AND RENEWED
                PETITION FOR A WRIT OF HABEAS
                CORPUS
                Case No.: C 09-00750 CRB

The four men had another meeting in the spring of 1984 at Fisherman's Wharf in San Francisco.  At some point in this meeting, Quartermain spoke alone with Anthony and/or McIntosh.  Younge was not present for this conversation, but according to Younge, Quartermain subsequently told him that the two FITC partners offered him $55,000 to kill Ewing.  Younge further testified that, at some point, Quartermain showed him a large amount of cash, which Quartermain told him was an up-front payment of half the money for the planned murder.  Throughout his testimony, Younge claimed that while he was aware of this plan, he was not involved in any way.

Younge also testified that he attended another meeting on April 25, 1984, which was critical to the prosecution's case.  Younge testified that the meeting was an "eyeball" meeting, where Anthony and McIntosh would identify the target (Ewing) to Quartermain.  Younge testified that he and Quartermain drove to a restaurant in Mill Valley and waited at the bar.  Then Anthony and McIntosh arrived with Ewing.  The two groups did not speak or otherwise interact, but Anthony and McIntosh walked Ewing by Quartermain so he would recognize the intended target.  Once again, Younge's understanding of the purpose of this meeting was based entirely on his conversations with Quartermain.[2]

Younge again maintained that, though he was present at the meeting, he was not part of the murder plot.  He testified that he only went because Quartermain did not like to drive and did not know his way around the city.  He also testified in general that he did what Quartermain wanted, in part because he was afraid of Quartermain.

After the killing, Younge said he saw Quartermain again, and Quartermain complained that Anthony and McIntosh did not pay him the remaining fee due for the killing.  Younge said he agreed to help Quartermain recover the money by suggesting Quartermain hire a lawyer and suing FITC in Younge's company's name.

---

[2] Given Quartermain's mental state, and the fact that the "eyeball" meeting itself was unnecessary, since Anthony eventually drove Ewing to meet Quartermain, it is likely Quartermain created a nefarious purpose behind an innocuous encounter (an "idea of reference" explained in the Shapiro declaration and below).  McIntosh's trial counsel could not pursue that defense, however, because the State withheld all of Quartermain's psychological records.

5                    FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

### C. Chandler's Testimony and Other Evidence

Younge's testimony unquestionably provided the most important evidence against McIntosh, but the State sought to corroborate his testimony with other circumstantial evidence. The State's second most important witness was Deborah Chandler, who drove Quartermain to the site of the murder and was present when Ewing was shot. Chandler testified to the basic facts of the killing itself.

Chandler had no direct evidence linking McIntosh to the murder, but she did offer one piece of evidence that was critical. She testified that Quartermain told her that two "rich guys" paid him to commit the crime. The State argued that "rich guys" must have referred to Anthony and McIntosh, and thus that Chandler's testimony corroborated the fact that this was indeed a murder-for-hire plot involving McIntosh.

The State offered little other evidence linking McIntosh to the crime, and what it did offer was circumstantial. It offered evidence that around the time of the killing, there were phone calls between Anthony, McIntosh, and Quartermain—but the contents of those calls was unknown. The State also presented evidence regarding the business dispute between Ewing and FITC, arguing that the disagreement over money provided the motive for Anthony and McIntosh to hire Quartermain.

### D. Conviction and Appeal

The jury convicted McIntosh of murder in December 1990. He was sentenced to life without the possibility of parole. He appealed.

Much of his appeal centered on the admission of second-hand hearsay statements, since Younge's recounting of Quartermain's out-of-court statements provided the primary evidence against McIntosh. At trial, most of these statements were admitted under the coconspirator exception. On appeal, the California Court of Appeal held that several key statements were improperly admitted, both because they were after the conspiracy had terminated and because they were not in furtherance of the conspiracy. Nonetheless, the appellate court held that the errors were harmless because McIntosh's conviction was sufficiently supported by other evidence—namely: (a) Younge's testimony regarding other properly admitted hearsay, (b) Younge's testimony about seeing McIntosh

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

at the eyeball meeting at the Mill Valley restaurant, (c) Chandler's hearsay testimony that Quartermain said "rich guys" had paid him to kill Ewing, and (d) telephone records that Quartermain called McIntosh's home hours before the murder.

## III.   Exculpatory Evidence Withheld by the State

The conviction and sentence in this case rest primarily on the credibility of Younge, the star witness against McIntosh, and also the credibility of Quartermain, the hearsay declarant who (at least according to Younge) made the out-of-court statements linking McIntosh to the crime.  The case turned on Quartermain's credibility to honestly report to Younge what he heard and what he did, and on Young's credibility to repeat Quartermain's statements and to accurately report events he observed.  Pursuant to its obligations under *Brady*, *Napue*, and *Giglio*, the State unquestionably had a duty to provide to the defense all exculpatory evidence in its possession, including evidence that could have been used to impeach State witnesses.

But the State failed to do so, and as a result, the jury did not hear the truth.  Years after his conviction, McIntosh, along with his attorneys and investigators, began to uncover new evidence that was withheld or hidden by the State.  This evidence, if presented at trial, would have thoroughly undermined the prosecution's case.

There are at least four critical pieces of exculpatory evidence that were withheld or hidden by the state.

*First*, the jury did now know that Quartermain had been adjudged incompetent, a paranoid schizophrenic, and psychotic.  Doctors in New York determined that Quartermain reacted "impulsively with aggression in situations *where he misinterprets reality significantly*."  Shapiro Dec. ¶¶ 249 et seq.  They also found that Quartermain engaged in bizarre behaviors, and formed delusions.  Florida doctors determined that Quartermain suffered from "delusions of persecution, and/or of grandeur, ideas of reference, and often hallucinations."  He was hostile, aggressive and delusional.  According to Wikipedia, "ideas of reference" is a Freudian concept that describes "the phenomenon of an individual's experiencing innocuous events or mere coincidences and believing they have strong personal significance."  Instead of disclosing that information, the State filtered

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

Quartermain's stories through Younge's slick exterior, who one judge described as playing "games" with the lawyers.  Shapiro Dec. ¶ 267.

*Second*, Younge lied to the jury when he said McIntosh was at the eyeball meeting on April 25, 1984.  McIntosh had an alibi witness for that date, and, to protect Younge's story, the State threatened McIntosh's alibi witness into refusing to appear at the trial. The jury heard Younge's false account of the meeting and was deprived of the truth about McIntosh's whereabouts that day and Younge's perjury.

*Third*, Younge lied to the jury about his relationship with Quartermain.  Younge was not a scared mouse innocently reporting Quartermain's inculpatory statements, but rather a long-time confederate of Quartermain and other members and associates of the Bruno-Scarfo Mafia family in Philadelphia.  If anything, the truth is that in their criminal relationship, Younge was the mastermind who pulled the strings, and who used Quartermain as his muscle.

*Fourth and finally*, the State manipulated Chandler's testimony so that she would corroborate Younge:  Chandler went from saying nothing to police investigators about anyone hiring Quartermain to kill Ewing, to testifying at Quartermain's trial in 1989 only that she *assumed* there were well-to-do people who hired Quartermain.   Shapiro Dec. ¶ 125; *see* ¶¶ 117-130.  When she was asked about her ever-changing testimony years later, she admitted that the prosecutor gave her the information about "rich guys" having paid Quartermain to kill Ewing.

If the jury knew the truth, it never would have convicted McIntosh.  Although the truth may never be known, the new evidence suggests a substantial likelihood that it was in fact Younge who orchestrated the killing, and that McIntosh had not hired Quartermain.  At the minimum, if the State had properly disclosed evidence, there is a reasonable possibility that the outcome of McIntosh's trial would have been different.

## PROCEDURAL HISTORY – HABEAS PROCEEDINGS AND DISCOVERY

### I.   Initiation of Habeas Proceedings

On April 21, 1997, McIntosh filed a federal habeas petition pursuant to section 2254, Docket No. 97-1427-VRW.  The case was transferred to this Court.  That petition was timely under

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

AEDPA's newly enacted statute of limitations.  Shapiro Dec. ¶ 131.  AEDPA was new, and the courts had not yet decided how to harmonize the new federal one year statute of limitations with the requirement that state inmates exhaust their arguments in state court (which can take years) before filing in federal court.  Based on a Supreme Court precedent, *Rose v. Lundy*, 455 U.S. 509, 510 (1982), this Court dismissed McIntosh's petition without prejudice to renewing it at a later date, after he pursued relief in the state courts.

Between that dismissal and 2006, McIntosh and his investigator, Gary McDaniel, slowly obtained the information underlying the instant petition.  Doc. 3-1 at 45-51; Doc. 3 at 9-44.

On July 14, 2006, soon after the State refused to reduce McIntosh's sentence in return for his cooperation, McIntosh filed a state habeas petition in the Superior Court for the County of San Mateo.  Doc. 12-1.  The court denied McIntosh's motion as untimely because it was filed 15 years after conviction and McIntosh failed to explain "the delay of twelve years in hiring the private investigator."  Doc. 12-1 at 7.  In the context of considering the timeliness of McIntosh's petition, the court considered whether the State violated *Brady* and concluded that it had disclosed some prior criminal conduct of Younge.  It ruled that McIntosh did not show that he attempted to obtain Greene's testimony and such testimony would not have established "actual innocence."[3]

On August 28, 2007, McIntosh filed a state habeas petition in the California Court of Appeal. That petition was denied as untimely on March 13, 2008.  Doc. 12-4.  On May 27, 2008, McIntosh filed a habeas petition with the California Supreme Court. That petition was denied as untimely on February 11, 2008.  Doc. 12-5.  In their fairly summary denials, both the Court of Appeal and Supreme Court Both the Court of Appeal and Supreme Court denials cited to *In re Robbins*, 18 Cal.4th 770, 780, indicating a denial based on untimeliness.  *See Walker v. Martin*, 562 U.S. 307, 313

---

[3] The court did not define its understanding of "actual innocence."  Under federal law, actual innocence does not mean a petitioner must prove he didn't commit the crime.  It means only that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995).  In other words, it focuses on the prosecution's proof in light of new evidence, and not on whether a petitioner has been able to solve the crime in some way different from the prosecution's theory.  The Superior Court decision suggests that it thought the latter was the proper standard.

(2011) ("A summary denial citing *Clark* and *Robbins* means that the petition is rejected as untimely.").

On February 19, 2009, McIntosh re-filed his federal habeas petition, raising the arguments he had been asserting since 2006. Doc. 1. This Court denied the petition, but the Ninth Circuit granted a certificate of appealability to allow McIntosh to explain why the one year statute of limitations did not bar him from raising his habeas claims. Doc. 35.

The Ninth Circuit appointed McIntosh's current counsel on July 15, 2013. This Court granted McIntosh's motion for an indicative order that it would reconsider its dismissal of his habeas petition, and the Ninth Circuit remanded.

## II.   Discovery Motions

Between November 2013 and the present (and discovery from the federal government is still largely not completed) – almost three years – McIntosh tried to get at the truth about the State's two primary witnesses, Younge and Quartermain. He filed several discovery motions – primarily because the State and federal government had produced nothing about their witnesses before his trial.

These discovery requests were directed at both the State and the federal government, because McIntosh had reason to believe that both possessed relevant exculpatory evidence regarding Younge and Quartermain. Moreover, the State and federal authorities worked closely together in investigating both the McIntosh's federal prison helicopter escape and also the Ewing murder. Throughout the investigation, they acted as a joint prosecution team.

Both State and federal authorities consistently resisted all discovery efforts. Nevertheless, enough information has emerged to corroborate what McIntosh learned from other prisoners (including government cooperators), and from witnesses in the case against him, to justify his release from prison now.

//

//

//

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

**III.    Revelations from the State's Disclosures**

The accompanying Shapiro declaration details what the State's files – including files that were certainly kept secret until this Court ordered their disclosure – revealed about the issues raised by McIntosh.[4]  The evidence is summarized here.

**A.    *The Police Intimidation of McIntosh's Alibi Witness***

The State knew that McIntosh had an alibi witness, Jim Greene.  Before McIntosh's trial, it had copies of US Marshal reports revealing the federal government's suspicion that Greene helped McIntosh escape from federal custody, and it had McIntosh's application to the trial court to subpoena Greene for trial.  Shapiro Dec. ¶¶ 39, 211-218.  An FBI report (only recently disclosed) described the close working relationship:  as "a result of this [FBI] liaison with local authorities on matters of mutual interest; the sharing of information, and the continued police investigation into the murder case, this attached article reveals a possible successful outcome regarding subject McINTOSH'S involvement in past and present criminal activities with others."  Shapiro Dec. Ex. 62.

Unbeknownst to McIntosh at the time of his trial, the reason Greene refused to testify was because the police interviewed him and intimidated him – which Greene has described in two declarations filed with this Court.  The State never advised McIntosh of its interview or its threats to Greene.  Only during the course of discovery here did ADA Murray admit, in his answers to interrogatories, that he sent the investigators to interview Greene.  And worse, the State pretended

---

[4] The State failed to keep any log of the material it produced to McIntosh before his trial (despite the state court's 33 paragraph discovery/*Brady* order that specified distinct categories of items to be produced).  One would have to guess at what was produced.  The failure to maintain logs of what was, and was not produced, even if merely reckless, is a violation of a prosecutor's constitutional obligations. *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008) ("failure to produce documents and to record what had or had not been disclosed, along with the affirmative misrepresentations to the court of full compliance, support the district court's finding of 'flagrant' prosecutorial misconduct even if the documents themselves were not intentionally withheld from the defense").

The one set of documents that McIntosh can be confident was never produced was the set of Secret Documents (including Quartermain's mental health records) because, even in 2014 and 2015, the State resisted disclosing that information.  Shapiro Dec. ¶¶ 160-162 and Doc. 105 and 105-1.

1  at trial – in a passionate rebuttal closing argument by ADA Murray – that it was shocked to hear

2  McIntosh's argument that the State should have followed up on alibi evidence that would have

3  exculpated McIntosh, and even attacked the defense for its suggestion otherwise.

4      Greene's experience is corroborated in the accompanying declaration of his former attorney,

5  Jerry Newton.

6      **B.  The Suppression of Quartermain's Psychosis and Schizophrenia**

7      The State knew that Quartermain was a paranoid schizophrenic, psychotic, delusional, and

8  incompetent – it had Quartermain's hospital and prison records in its Secret Files – and the federal

9  government undoubtedly knew the same because Quartermain was evaluated by the Justice

10 Department before entering the Witness Security Program.  Yet, the State never disclosed any of

11 that information to McIntosh.  Given that Quartermain's alleged statements to Younge were the

12 most damning evidence against McIntosh, there can be no question that the jury would have

13 disbelieved Quartermain (and Younge) when they implicated McIntosh in the plot.

14     **C.  The Younge Perjury**

15     The State relied solely on Younge – the State's star witness and an admitted perjurer – to

16 provide it with *Brady* material about himself.  It accepted, without any investigation, Younge's

17 contention that he accompanied Quartermain to meetings and had conversations about an

18 impending murder because Younge was afraid of Quartermain (and thought his best protection was

19 to keep Quartermain close to him and participate in meetings with Quartermain).  As a consequence

20 of the State's gullibility or guile, the State turned a blind eye to its *Brady* obligations and obtained

21 nothing from the federal government about Younge or Quartermain.

22     As it turns out, the State knew about Quartermain's and Younge's relationship to the

23 Philadelphia Mafia and their association with one another in the methamphetamine business in the

24 Philadelphia area.  The State had an ATF report discussing Quartermain's Mafia connection, and its

25 investigators interviewed George Reicherter (someone in the Philadelphia methamphetamine and

26

27

28                 12         FRCP 60 MOTION AND RENEWED

1  P2P business[5] who Quartermain tried to kill).  Thus, Carl Jackson, George Martorano and Carl

2  Surrell are credible when they declare that Quartermain and Younge knew each other years before

3  both were incarcerated together in 1983 and 1984; Quartermain did strong arm work for Younge;

4  both were involved with the same Mafia family (the Bruno-Scarfo family) in Philadelphia; and both

5  were heavily involved in the methamphetamine business in Philadelphia.  Their undisputed

6  accounts ring true.  The FBI's "informant file" covering Younge confirms that Martarano knew

7  what he was talking about: a report states that Younge sold P2P to Martorano in 1981.  A DEA

8  report recently produced confirms that Younge used people for strong-arm work in his drug

9  business.  Shapiro Dec. ¶ 107.

10  The true Younge/Quartermain relationship, and their relationship to the Bruno-Scarfo

11  family, was not just an interesting anecdote.  Had McIntosh known it, he would have had a strong

12  argument that Younge falsely accused him to cover his own extortion scheme.  Quartermain and

13  Younge tried to insinuate themselves into McIntosh's business, which Younge believed was illegal,

14  and McIntosh rebuffed them.  When they learned that Ewing was threatening to expose FITC, they

15  decided to kill Ewing and step into his shoes, so they could shakedown McIntosh and Anthony for

16  hush money about the business.  That was an established practice of the Bruno-Scarfo family.  *See*

17  *United States v. Pungitore*, 910 F.2d 1084, 1102 (3d Cir. 1990) ("In early 1982, Scarfo approved a

18  scheme to extort money from drug dealers and bookmakers.").

19  ### D.   The State's Coaching of Chandler

20  Gary McDaniel interviewed Chandler in 2005, and she told him that the prosecutor fed her

21  the information she testified about at McIntosh's trial.  But the State already knew that.  In October

22  1997, after Quartermain's conviction had been reversed, *People v. Quartermain*, 16 Cal. 4th 600

23  (1997), his defense lawyer, James R. Ramos, interviewed Chandler.  He wrote a memo – which the

24  State turned over only recently – reporting that Chandler told him, "I needed to know what they [the

25  police] knew.  The first few times I talked to them, they didn't know anything but that changed.

27  [5] P2P is a precursor chemical used to manufacture methamphetamine.  Younge was the P2P supplier to the Philadelphia Mafia.

1  They knew things only Drax would know and that's when I knew I had to protect myself.  This

2  went on for a long time.  They talked to me over months and you know the one that really told me a

3  lot was that DA, Constantinides.  He told me more than the detectives did." Ex. 47 at 3

4  (handwritten underlining in version provided by the State).

5      Ramos's memo was not turned over to McIntosh.

6  **IV.  Revelations from the Federal Disclosures**

7      The federal government's response to this Court's discovery orders and McIntosh's court-

8  authorized subpoenas reflects the worst kind of obstructionist tactics designed to impede a search

9  for the truth.

10      This Court issued a discovery order in December 2013.  The State disclaimed that it

11  represented the federal government, despite having filed a notice of appearance for the federal

12  government in 2009.

13      The federal government then appeared.  On February 24, 2014, the US Attorney's Office

14  ("USAO") wrote a letter stating that "thus far" the government "found nothing responsive to the

15  discovery orders" and that it would "continue its search."  Doc. 66-1 at 9.  McIntosh asked what the

16  USAO had done to look for information, and the USAO refused to divulge that information.  Doc.

17  66 at 2 ¶5.  Instead, the USAO advised McIntosh that the government would never produce

18  documents from the Witness Security Program.  Shapiro Dec. ¶ 170.

19      In January 2015, after reviewing the State's production – and finding evidence of the federal

20  and State collaboration on the Ewing investigation – McIntosh tried again and asked for the Court's

21  help in getting information from the federal government.  Doc. 105. This time, the Court directed

22  the USAO to file a declaration about what it had done to search for records, and that declaration

23  revealed the USAO's complete failure to comply with the Court's order.  Shapiro Dec. ¶ 174.  It

24  authorized McIntosh to issue subpoenas to the federal agencies.  Shapiro Dec. ¶ 174-175.

25      The responses to the subpoenas were pathetic.  Agencies produced newspaper articles and

26  blacked-out reports (redacted based on FOIA and tax laws about confidentiality – but really just

27  eliminating names of possible witnesses, including agents, among other important information).

28              14        FRCP 60 MOTION AND RENEWED
                          PETITION FOR A WRIT OF HABEAS
                          CORPUS
                          Case No.: C 09-00750 CRB

Doc. 160.  For its part, the FBI – the agency that knew much about Younge – said there were no responsive "non-privileged" files.  Shapiro Dec. ¶ 177.  The ATF produced only reports related to the same ATF report that McIntosh found in the State's Secret Files – the previously undisclosed report linking Quartermain to the Bruno-Scarfo family's drug business.  Only the DEA produced some responsive reports – including a report stating that Earl Rutherford did "strong arm" work for Younge – thus undermining Younge's claim at McIntosh's trial that he was a non-violent man. Shapiro Dec. ¶ 107.

The FBI's "search" was limited to running names through a database.  Because "Younge" was a made-up name – and the FBI gave Younge an informant number that was used throughout its reports – the FBI disingenuously claimed it found nothing other than Younge's informant file.  That informant file – as short as it was – revealed significant previously-undisclosed information favorable to McIntosh: Younge supplied P2P to George Martorano – a witness who provided a declaration in this case about Younge's association with Quartermain.  That confirms Martorano's personal knowledge of Younge and a strong basis to believe him when he swore that Younge and Quartermain were criminal associates before their incarceration together in 1983.  Younge thus perjured himself about his relationship with Quartermain at McIntosh's trial.

Because McIntosh pointed out that the Younge informant files indicated that much of the information from Younge was not in those files but rather was in the undercover operations files, the Court directed the government to explain why those files should not be reviewed for favorable information.  Shapiro Dec. ¶ 197 et seq.  After hearing from the government, the Court ordered the government to review the operations files for *Brady* information, directed the FBI to turn over the document referring to Quartermain that is in the operations file, and directed the government to provide criminal history reports of Younge and Quartermain. Shapiro Dec. ¶¶ 200 et seq.  The USAO then admitted that it was incapable of conducting a *Brady* review, failed to turn over the Quartermain document in the operational files, and failed to provide criminal history reports – claiming the US Marshal Service could not find any.  Docs. 200, 203.  The government still has not complied with the Court's order.

FRCP 60 MOTION AND RENEWED
                    PETITION FOR A WRIT OF HABEAS
                    CORPUS
                    Case No.: C 09-00750 CRB

Recently, the US Marshal Service's Witness Security Program and the ATF revealed that Quartermain was accepted into the federal government's Witness Security Program ("WitSec") in 1977. The US Marshal Service changed his name from Russell Weston to Drax Quatermain (and not to Drax Quartermain, the name he was prosecuted under). Quatermain is the name he was prosecuted under in federal court in Philadelphia, *United States v. Quatermain*, 613 F.2d 38 (3rd Cir. 1980)). Quartermain also was known to law enforcement as "Dray Quarterman" (the name on the criminal history report in Quartermain's WitSec file). The State never shared documents reflecting the names or information about "Quarterman" or "Quatermain" with McIntosh, let alone under the names Weston and Quartermain.

In sum, the federal government has managed to do what it did before McIntosh's trial – withhold impeachment evidence relating to Quartermain and Younge – except for the few significant facts described above. The USAO promised that the government would never reveal information in the WitSec files, and it has largely kept that promise. McIntosh's trial counsel flew blind: he got nothing about the only two witnesses against his client.

## ARGUMENT

This is an extraordinary case. If all of the evidence had been known at the time of trial, McIntosh would not have been convicted. But in large part due to the State and federal governments' failure to disclose, critical exculpatory evidence was not uncovered until years or even decades after trial. That delay implicates additional procedural hurdles to relief. Nonetheless, under established law, this petition should be heard on the merits, and McIntosh is entitled to relief. But for the governments' failure to disclose critical exculpatory evidence, there is a reasonable probability that the result at trial would have been different.

## I.      MCINTOSH'S HABEAS PETITION IS TIMELY

A federal habeas petition pursuant to section 2254 must be filed within one year from the latest of (a) the date on which the judgment became final at the conclusion of direct review, (b) the date on which the impediment to filing an application created by State action in violation of the Constitution or law of the United States is removed, (c) the date on which the Supreme Court

FRCP 60 MOTION AND RENEWED
PETITION FOR A WRIT OF HABEAS
CORPUS
Case No.: C 09-00750 CRB

1   recognized the constitutional right at issue, or (d) the date on which the factual predicate of the

2   claim presented could have been discovered through the exercise of due diligence.  28 U.S.C §

3   2244(d)(1).

4        McIntosh complied with the statute of limitations, and in the alternative, even if he did not,

5   he is entitled to equitable tolling or relief under the "actual innocence" exception."

6        ***A. McIntosh Complied with the Federal Statute of Limitations***

7        When an inmate seeks relief in state court before filing his federal petition, the time during

8   which his state petitions are pending tolls the federal statute of limitations, 28 U.S.C. § 2244(d)(2),

9   though not if the state courts deny the state petitions as untimely.  *See Pace v. DiGuglielmo*, 544

10  U.S. 408, 416-17 (2005).  The Supreme Court in *Pace* held that petitioners can avoid the harshness

11  of the *Pace* rule, however, by filing a "'protective' petition in federal court and asking the federal

12  court to stay and abey the federal habeas proceedings until state remedies are exhausted."  For those

13  petitioners, like McIntosh, whose obligation to file arose before the "stay and abey" procedure, "a

14  petitioner's reasonable confusion about whether a state filing would be timely will ordinarily

15  constitute 'good cause' for him to file in federal court."  *Id.* (citing *Rhines v. Weber*, 544 U.S. 269,

16  277, 125 S. Ct. 1528, 1535, 161 L. Ed. 2d 440 (2005)).  An inmate will generally be excused unless

17  he has intentionally engaged in "dilatory litigation," *id.* at 278.

18       McIntosh filed his first federal habeas petition within one year of AEDPA's effective date.

19  This Court dismissed the petition *without prejudice*, thus leading McIntosh to believe that he could

20  re-file after pursuing all of his claims in state court, as was then the practice in federal courts.

21  McIntosh did just that; he developed the evidence over several years, while behind bars, that formed

22  the basis of his state petitions, and then filed those claims in state court between 2006 and 2009.

23  There is no suggestion that McIntosh was dilatory.  Thus, McIntosh's current federal petition is

24  properly filed and timely under *Pace v. DiGuglielmo* given his original, timely-filed federal

25  petition.

26  //

27  //

28
                          17        FRCP 60 MOTION AND RENEWED
                                    PETITION FOR A WRIT OF HABEAS
                                    CORPUS
                                    Case No.: C 09-00750 CRB

### 1. Equitable Tolling of the Statute of Limitations

McIntosh is also entitled to equitable tolling.  If a petitioner violates the federal statute of limitations – and especially if he violates it because the state courts chose not to reach the merits of his petition and statutory tolling of the statute of limitations is unavailable – then his federal claims are tolled when he establishes the cause for his failure and prejudice to his rights.  *See Walker v. Martin*, 562 U.S. 307, 315 (2011) (citing to *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977)); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.").  A state court's denial of state habeas petitions as untimely has no influence on the federal cause-and-prejudice analysis.  *See Rudin v. Myles*, 781 F.3d 1043, 1054 n. 14 (9th Cir. 2015) ("Equitable tolling under *Holland v. Florida* is a federal doctrine entirely separate from state law"), *cert. denied sub nom. Gentry v. Rudin*, 136 S. Ct. 1157 (2016).

A petitioner thus is entitled to equitable tolling of the time in which to file his habeas petition if he shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotation marks omitted).   "Due diligence does not require 'the maximum feasible diligence,' but it does require reasonable diligence in the circumstances."  *Ford v. Gonzalez*, 683 F.3d 1230, 1235 (9th Cir.) *cert. denied*, 133 S. Ct. 769 (2012).

Put differently, when the State suppresses *Brady* material, it has interfered with a petitioner's ability to bring his claim and that is "cause" for his default.  *See Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 282-83 (1999); *see also Frost v. Gilbert*, No. 11-35114, 2016 WL 1085228, at *5 (9th Cir. Mar. 21, 2016) (cause established where state officials failed to respond accurately to inmate's requests for information:  "No doubt, he would

18   FRCP 60 MOTION AND RENEWED PETITION FOR A WRIT OF HABEAS CORPUS
Case No.: C 09-00750 CRB

1  have presented allegations of *Brady* and *Napue* violations in that petition, had he been aware of the

2  facts supporting those arguments."); *Quezada v. Scribner*, 611 F.3d 1165, 1168 (9th Cir. 2010).

3       Here, the cause of McIntosh's late filing in this Court (if it was late) is obvious:  the State and

4  federal government suppressed the truth about Quartermain and Young, failed to disclose its

5  improper coaching of Chandler, failed to disclose Chandler's admission to Quartermain's lawyer in

6  1997 that the prosecutor gave her information provided to them by Quartermain, suppressed the

7  State's own intimidation of Greene, and suppressed the truth about Quartermain's mental state.

8       McIntosh also explained why he could not have obtained the information before:  the federal

9  government refused to turn over the Younge and Quartermain background information, his original

10  investigator could find nothing because Younge and Quartermain changed their identities,[6] and it

11  was only when McIntosh found himself in the federal Witness Security Program, with people who

12  knew Younge and Quartermain, that he learned the truth about them.

13       In short, McIntosh has established cause for any default.  He has also established prejudice.

14  In any *Brady* analysis, "prejudice" means "there is a reasonable probability that the result of the trial

15  would have been different if the suppressed [evidence] had been disclosed to the defense." *Strickler*,

16  527 U.S. at 289.  The situation here is akin to that in *Kyles*, where the prosecution identified the

17  defendant through a supposed witness to the murder (Beanie), who did not testify, but whose

18  changing statements to the police were not disclosed to the defense.  514 U.S. at 430.  The

19  undisclosed information about the State's critical witnesses undoubtedly prejudiced McIntosh; the

20  negative information about Younge, Quartermain and Chandler went directly to whether they were

21  telling the truth on the stand.  The failure to provide information *about the facts of the case itself*

22  cannot be cumulative.  *See Banks v. Dretke*, 540 U.S. 668, 702 (2004) (nondisclosure of a witness'

23  "true role in the investigation and trial of the case" could not be cumulative, especially where the

24  prosecution "turned to its advantage remaining impeachment evidence"); *Horton v. Mayle*, 408 F.3d

25  570, 579 (9th Cir. 2005) (where undisclosed evidence would provide "powerful and unique

26  ───────────────────

27      [6] *See* Affidavit of investigator Holbert, Doc. 3-1 at 21-22 (inability to locate information because of the lack of true names and identifying information); affidavit of investigator McDaniel, Doc. 3 at 10-13.

28                    19          FRCP 60 MOTION AND RENEWED

PETITION FOR A WRIT OF HABEAS

CORPUS

Case No.: C 09-00750 CRB

1  impeachment evidence demonstrating that McLaurin had an interest in fabricating his testimony,"

2  the State violated *Brady*).

3       In a witness suppression analysis, "prejudice" means that the prosecution's conduct

4  constituted "substantial interference" with the witness' decision whether to testify.  *See United*

5  *States v. Vavages*, 151 F.3d 1185, 1193 (9th Cir. 1998).

6       In an improper witness coaching situation, where a prosecutor has furnished the witness with

7  a phrase (like "rich guys") that incriminates the defendant, and that is unknown to the defendant,

8  then the prosecutor has knowingly used perjured testimony and any conviction must be overturned,

9  *Napue v. Illinois*, 360 U.S. 264 (1959); the prejudice in not revealing the improper coaching is

10  obvious.

11       The prejudice to McIntosh of the State's nondisclosures is clear:  he was without

12  information favorable to him that would help prove that Quartermain's, Younge's and Chandler's

13  testimony was fiction.  He was without a critical alibi witness who would have proved that Younge

14  was a liar and that McIntosh was truthful.

15              **2. The Actual Innocence Exception to the Statute of Limitations**

16       Finally and in the alternative, even if the petition is untimely, this Court should consider it

17  anyway under the actual innocence exception.  A petitioner is excepted from the federal statute of

18  limitations if he can show that he is "actually innocent."  *See McQuiggin v. Perkins*, 133 S. Ct. 1924

19  (2013) (upholding the use of three affidavits reflecting evidence of actual innocence to except the

20  case from the federal statute of limitations).

21       "Actual innocence" does not require McIntosh to prove he was innocent; it only requires

22  proof that it is more likely than not that a reasonable juror would not have found him guilty beyond

23  a reasonable doubt if the new evidence had been available at trial.  *See Schlup v. Delo*, 513 U.S.

24  298, 329 (1995); *Larsen v. Soto*, 742 F.3d 1083, 1094 (9th Cir. 2013) (granting habeas filed after

25  the expiration of the statute of limitations, where the state failed to disclose eye witnesses who

26  would have testified, contrary to the police witnesses, that the defendant did not commit the crime);

27  *Carriger v. Stewart*, 132 F.3d 463, 477-78 (9th Cir. 1997) (explaining that, in *Schlup*, the Supreme

28

1   Court contrasted "freestanding" actual innocence (evidence that the petitioner is probably innocent)

2   with "miscarriage of justice" actual innocence, which carries a lower threshold of proof and is

3   satisfied with proof of "innocence strong enough 'that a court cannot have confidence in the

4   outcome of the trial *unless* the court is also satisfied that the trial was free of nonharmless

5   constitutional error'").

6       The standard is not one of insufficiency—it is irrelevant whether the state might have

7   enough evidence on which a jury could conceivably still convict at retrial.  In *Schlup*, the Court

8   held that "petitioner's showing of innocence is not insufficient solely because the trial record

9   contained sufficient evidence to support the jury's verdict."  513 U.S. at 869.

10       A *Brady* violation may establish actual innocence.  For example, in *Sawyer v. Whitley*, 505

11   U.S. 333, 348 (1992), the Court analyzed whether suppressed *Brady* material met the actual

12   innocence test when the petitioner failed to show cause why he did not raise the claim in his first

13   habeas petition:  "we must determine if petitioner has shown by clear and convincing evidence that

14   but for constitutional error, no reasonable juror would find him eligible for the death penalty under

15   Louisiana law."  *Brady* material by its nature is exculpatory evidence and thus may demonstrate

16   actual innocence.  *See King v. Trujillo*, 638 F.3d 726, 729 (9th Cir. 2011) (*Brady* claim analyzed for

17   actual innocence).

18       Here, McIntosh has established actual innocence.  The fact that Quartermain was delusional

19   alone would have seriously undermined the State's case.  Add to that fact that Younge, the

20   messenger, perjured himself on the stand, and that the prosecution fed Chandler the information

21   about "two rich guys" hiring Quartermain, and the State's case lacks any foundation at all.  Finally,

22   if the jury knew that the State purposely intimidated Greene, it would have known that the

23   prosecution engaged in tricks to undermine the defense.  The jury would not have convicted.

24   **II.   THE DISTRICT COURT REVIEWS CONSTITUTIONAL VIOLATIONS DE NOVO**

25   **WHEN THE STATE COURTS DENIED THE CLAIMS ON PROCEDURAL**
     **GROUNDS**

26       If the state court denied the claim on a procedural ground (that is, it did not decide the merits

27   of the claim), then the district court must review the constitutional claim de novo.  The higher

28

21          FRCP 60 MOTION AND RENEWED
            PETITION FOR A WRIT OF HABEAS
                       CORPUS
            Case No.: C 09-00750 CRB

1    standard of review of a state court decision, set out in 28 U.S.C. § 2254(d), "does not apply when a

2    state court does not reach the merits of a federal claim. 'Where a state court does not reach the

3    merits of a federal claim, but instead relies on a procedural bar later held inadequate to foreclose

4    federal habeas review, we review de novo.'" *James v. Ryan*, 733 F.3d 911, 914 (9th Cir. 2013)

5    (citation omitted).  *See Davis v. Ayala,* 135 S. Ct. 2187, 2198 (2015) ("Section 2254(d) thus

6    demands an inquiry into whether a prisoner's 'claim' has been 'adjudicated on the merits' in state

7    court; if it has, AEDPA's highly deferential standards kick in.").

8            Here, the California court denied McIntosh's petitions as untimely.  That is a procedural

9    ground.  Since McIntosh's federal petition is timely under federal law, this Court considers the

10   merits of his constitutional claims de novo.

## III.    A PETITIONER MAY RELY ON FACTS NOT CONSIDERED BY STATE COURTS WHEN STATE HABEAS PETITION WAS DENIED ON PROCEDURAL GROUNDS

13           When state courts have decided a petitioner's claims on the merits, the state court factual

14   findings are presumed correct.  28 U.S.C. § 2254(e)(1).  However, when the state has denied a

15   petition as untimely, then the state has made no factual findings that must be presumed correct

16   under section 2254(e)(1).  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011) ("[R]eview

17   under § 2254(d)(1) is limited to the record that was before the state court *that adjudicated the claim*

18   *on the merits.*") (emphasis added).

19           In *Quezada v. Scribner*, 2011 WL 3652245 *4, *8 (C.D. Cal. Aug. 19, 2011), the court

20   explained that "the *Pinholste*r Court explicitly noted that its holding only applied to habeas corpus

21   claims that 'fall within the scope of § 2254(d),' meaning claims adjudicated on the merits in state

22   court proceedings. … To the extent Respondent is asserting that *Pinholster* precludes consideration

23   of new facts in the cause and prejudice analysis, Respondent is wrong because *Pinholster's*

24   prohibition on consideration of new evidence only applies to claims 'adjudicated on the merits.'"

## IV.    THE STATE VIOLATED *BRADY* AND *GIGLIO*

26           In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court declared that, regardless of

27   the good or bad faith of the prosecution, the suppression of evidence favorable to the accused

1   violates due process where the evidence is material to either guilt or penalty.  In *Giglio v. United*

2   *States*, 405 U.S. 150 (1972), the Court extended the *Brady* rule to cover evidence that would have

3   impeached prosecution witnesses.

4        Since *Brady* was decided, courts have required production of direct evidence and

5   impeachment evidence that is favorable to the defendant. The duty of disclosure is not limited to

6   evidence in the actual possession of the prosecutor.  Rather, it extends to evidence in the possession

7   of each and every member of the prosecution team, which includes investigative and other

8   government agencies.  *Kyles v. Whitley*, 514 U.S. 419 (1995); *see also Strickler v. Greene*, 527 U.S.

9   263, 275 n. 12 (1999).

10        "There are three distinct elements of a *Brady* violation:  First, [t]he evidence at issue must

11   be favorable to the accused, either because it is exculpatory, or because it is impeaching. … Second,

12   that evidence must have been suppressed by the State, either willfully or inadvertently. ... Third,

13   prejudice must have ensued."  *Shelton v. Marshall*, 796 F.3d 1075, 1083 (9th Cir.); *see Cone v. Bell*,

14   556 U.S. 449, 469 (2009) (evidence is subject to disclosure when it "could reasonably be taken to

15   put the whole case in such a different light as to undermine confidence in the verdict").

16        To "prevail on his *Brady* claim," a petitioner "need not show that he 'more likely than not'

17   would have been acquitted had the new evidence been admitted. He must show only that the new

18   evidence is sufficient to undermine confidence in the verdict."  *Wearry v. Cain*, 136 S. Ct. 1002,

19   1006 (2016) (citations and quotation marks omitted).  In *Kyles*, the Court explained that "the

20   adjective is important," and "[t]he question is not whether the defendant would more likely than not

21   have received a different verdict with the evidence, but whether in its absence he received a fair

22   trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 434.

23        *Brady* is a self-executing trial right.  *See United States v. Jennings*, 960 F.2d 1488, 1490 (9th

24   Cir. 1992) (the prosecution's Brady obligations are self-executing).  There is no ostrich defense to

25   the government's *Brady* obligations; the government cannot know some facts and then consciously

26   avoid finding out other *Brady* information.  It has an affirmative obligation to research its witnesses.

27   *See Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring 'prosecutor may hide,

28                                        23                    FRCP 60 MOTION AND RENEWED
                                                              PETITION FOR A WRIT OF HABEAS
                                                                          CORPUS
                                                              Case No.: C 09-00750 CRB

1  defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due

2  process.").  Nor can the State uphold its *Brady* obligations when it remains willfully ignorant of the

3  facts.  *Com. of N. Mariana Islands v. Bowie*, 236 F.3d 1083, 1091 (9th Cir. 2001).

4         The violation here is remarkably similar to that in *Milke v. Ryan*, 711 F.3d 998 (9th Cir.

5  2013), where the defendant sought files about the state's main witness against her and the trial court

6  quashed the subpoena.  Only after years of collecting evidence about the state witness' credibility

7  from other sources was Milke able to establish that the witness was a liar.  *Id*. at 1005 ("despite this

8  trove of undisclosed impeachment evidence, the post-conviction court rejected Milke's claim that

9  she'd been denied access to impeachment material").  The Ninth Circuit rejected the state trial

10  court's reasoning as contrary to federal law, reiterating that the prosecution must turn over *Brady*

11  material, including impeachment material, especially about a key witness.  A prosecutor has a "duty

12  to learn of any favorable evidence known to others," *id*. at 1006 (quoting *Kyles v. Whitley*, 514 U.S.

13  419, 437–38 (1995)).  "[M]aterial impeachment evidence isn't just discoverable; under *Giglio*, it

14  must be disclosed unilaterally as a matter of constitutional right."  *Id*.

15         In *Wilson v. Beard*, No. CIV.A. 05-2667, 2006 WL 2346277, at *4 (E.D. Pa. Aug. 9, 2006),

16  *aff'd,* 589 F.3d 651 (3d Cir. 2009), the court granted a state inmate's habeas petition where the state

17  failed to disclose a witness' psychiatric history:  "The particular information which was withheld

18  pertains to Jackson's prior criminal history, specifically his *crimen falsi* convictions and a

19  psychiatric evaluation which was done in connection with one of those convictions; Rahming's

20  psychiatric history …."  *See also State v. Hunt*, 615 N.W.2d 294, 301 (Minn. 2000) ("Where the

21  nondisclosed evidence [a psychological report concerning the witness] could have significantly

22  impeached the state's key witness, regardless of subsequent developments with that evidence, we

23  conclude that the defendant has suffered prejudice from the nondisclosure."); *State v. Allen*, No.

24  03C01-9708-CC-00367, 1999 WL 5173, at *5 (Tenn. Crim. App. Jan. 8, 1999) (prosecutor violated

25  *Brady* by failing to disclose evidence that state witness suffered from "psychotic behavior").

26

27

28                                    24            FRCP 60 MOTION AND RENEWED
                                                    PETITION FOR A WRIT OF HABEAS
                                                    CORPUS
                                                    Case No.: C 09-00750 CRB

1   The *Brady* violations here are clear.  First, the State has now revealed that Quartermain was

2   psychotic, schizophrenic, and delusional.  It cannot dispute that it violated *Brady* regarding

3   Quartermain – a witness whose statements were offered through Younge.

4   Second, with respect to Younge, McIntosh has demonstrated with sworn affidavits from

5   people with personal knowledge, and with the State's and federal government's own documents,

6   that Younge lied on the stand about seeing McIntosh at the eyeball meeting and the nature and

7   length of his criminal relationship with Quartermain.

8   Finally, the State knew at the time it coached Chandler, and then again in 1997 when Ramos

9   interviewed Chandler, that the State investigators and/or prosecutor fed information to Chandler

10   about the "rich guys."

## V.    THE STATE VIOLATED *MOONEY-NAPUE*

12   Related to *Brady*, the government has parallel obligations under *Mooney* and *Napue*.  Where

13   the State's key witness lies, and the prosecution knows it (or fails to correct it), then the conviction

14   must be reversed.  The deliberate deception of a court and jurors by the presentation of known false

15   evidence is incompatible with "rudimentary demands of justice."  *Mooney v. Holohan*, 294 U.S.

16   103, 112 (1935):

> [Due process] is a requirement that cannot be deemed to be satisfied by mere notice
> and hearing if a State has contrived a conviction through the pretense of a trial which
> in truth is but used as a means of depriving a defendant of liberty through a deliberate
> deception of court and jury by the presentation of testimony known to be perjured.
> Such a contrivance by a State to procure the conviction and imprisonment of a
> defendant is as inconsistent with the rudimentary demands of justice as is the
> obtaining of a like result by intimidation.

21   In *Napue v. Illinois*, 360 U.S. 264 (1959), the Supreme Court reiterated that a conviction

22   obtained through use of false testimony, known to be such by representatives of the State, is a

23   denial of due process. It is also a denial of due process when the State, though not soliciting false

24   evidence, allows it to go uncorrected when it appears. In cases involving false or misleading

25   testimony, a new trial is required if "the false testimony could . . . in any reasonable likelihood have

26   affected the judgment of the jury . . . ." *Napue*, 360 U.S. at 271.  *See Dow v. Virga*, 729 F.3d 1041,

27   1048 (9th Cir. 2013) ("courts apply a less demanding materiality standard [than harmless error] to

28                                                25                    FRCP 60 MOTION AND RENEWED
                                                                       PETITION FOR A WRIT OF HABEAS
                                                                       CORPUS
                                                                       Case No.: C 09-00750 CRB

*Napue* errors: whether 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'").

Creating a false impression about critical evidence similarly violates due process. *See Miller v. Pate*, 386 U.S. 1, 6-7 (1967) (where prosecution misled the jury into thinking paint on a pair of shorts was blood, the conviction violated due process: "More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. … There has been no deviation from that established principle.").

Conscious avoidance of the truth equals knowledge. *See Com. of N. Mariana Islands, supra.* Knowledge of the falsity of a witness testimony means the conviction must be reversed.

Here, the State violated the *Napue* principle four times: first, when it presented Younge as a credible witness, whose observations were only heightened by his fear of Quartermain; second, when it presented Younge's testimony about the eyeball meeting knowing that Greene would have provided an alibi; third, when it presented Chandler's false testimony about the "rich guys" who supposedly hired Quartermain; and fourth, when it allowed Singleton's testimony about McIntosh's alibi to go uncorrected – and then exploited the false testimony during its summation.

## VI.  THE STATE INTERFERED WITH MCINTOSH'S ABILITY TO PRESENT HIS OWN WITNESSES

A defendant has a constitutional right to "present his own witnesses to establish a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  Interfering with that right – with or without a defense subpoena – requires reversal. *See United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998) (reversing conviction where a prosecutor threatened an alibi witness with prosecution for perjury:  "It is well established that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.'") (citation omitted); *Earp v. Ornoski*, 431 F.3d 1158, 1170-71 (9th Cir. 2005) ("coercive or threatening behavior towards a potential witness may justify reversal of a defendant's conviction").

FRCP 60 MOTION AND RENEWED PETITION FOR A WRIT OF HABEAS CORPUS
Case No.: C 09-00750 CRB

Here, the police intimidated Greene so that he refused to testify to an alibi for the date of the April 25, 1984 eyeball meeting.  The eyeball meeting was critical to the State's case and critical to the California Court of Appeal's decision affirming McIntosh's conviction – and McIntosh was not at that meeting.  The prosecutor admits he sent the investigators to interview Greene, and Greene and his lawyer both confirm the intimidation.  McIntosh was denied his right to present his witness.

## CONCLUSION

The foregoing petition summarizes the exculpatory evidence that was, as a result of the State and federal governments' combined failure to disclose, never presented at the petitioner's trial.  That evidence is set forth in greater detail in the accompanying declaration and exhibits.  Based on that evidence, as well as the arguments above, McIntosh has demonstrated that he is entitled to relief.  He therefore respectfully requests that this Court grant his habeas petition, release him on bond, and order state authorities to grant him a new trial.

Dated:  May 6, 2016

BOERSCH SHAPIRO LLP

*/s/ David W. Shapiro*
David W. Shapiro

Attorney for Ronald J. McIntosh

*/s/ Ted Sampsell-Jones*
Ted Sampsell Jones

*Not admitted in California