**Pages 1 - 40**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Charles R. Breyer, Judge

RONALD J. MCINTOSH,                  )
                                     )
            Plaintiff,               )
                                     )
   VS.                               )          **NO. CV 09-00750-CRB**
                                     )
ATTORNEY GENERAL ERIC H.             )
HOLDER, JR., ET AL.,                 )
                                     )
            Defendants.              )
_____  )


                              San Francisco, California
                              Friday, March 24, 2017

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    BOERSCH SHAPIRO LLP
                    1611 Telegraph Avenue - Suite 806
                    Oakland, CA  94612
               BY:  **DAVID W. SHAPIRO, ESQUIRE**




For Defendants:

                    CALIFORNIA STATE ATTORNEY GENERAL'S
                    OFFICE
                    455 Golden Gate Avenue - Suite 11000
                    San Francisco, CA  94102
               BY:  **PAMELA K. CRITCHFIELD**
                    **DEPUTY ATTORNEY GENERAL**




Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter

<u>**Friday - March 24, 2017**</u>                                    **9:56 a.m.**

                      **P R O C E E D I N G S**

                          **---oOo---**

          **THE CLERK:**  Calling CV 09-750, McIntosh vs. Holder,
et al.

     Counsel, please state your appearances for the record.

          **MR. SHAPIRO:**  Good morning.  David Shapiro for
Mr. McIntosh.

          **THE COURT:**  Mr. Shapiro?

          **MR. SHAPIRO:**  Yes.

          **THE COURT:**  You're on that side of the --

          **MR. SHAPIRO:**  Plaintiff's side.

          **THE COURT:**  That's the Government's side.  Is this by
force of habit that you took that side?

          **MR. SHAPIRO:**  It might have been, but it's been quite
a while.

          **THE COURT:**  Okay.  Just giving him a rough time.

          **MS. CRITCHFIELD:**  Pam Critchfield for the State of
California Attorney General's Office.

          **THE COURT:**  Good morning.  Thank you so much.

     Well, welcome to the oldest case I have.  It must seem
like an old case for all of you, both of you; right?

     Here is what I now see the playing field out there -- and
you can -- if you think I'm wrong, you should be heard on this
issue.

1      There are two, what I call, unexhausted or new claims.

2  One is Quartermain -- Quartermain's --

3          **MR. SHAPIRO:**  I think that's right.

4          **THE COURT:**  -- mental health history.  And second is

5  any evidence or information regarding the relationship between

6  Quartermain and Young or Younge.

7          **MS. CRITCHFIELD:**  Younge.

8          **THE COURT:**  Okay.  Those are unexhausted, as I

9  understand the record.

10      The exhausted claims -- there is an argument that there is

11  new evidence with respect to the exhausted claims.  One is the

12  intimidation of would-be alibi witness David Greene.

13      Second is the so-called -- these are just allegations --

14  coaching of the prosecution witness, Deborah Chandler.

15      And the third is Younge's criminal history.

16      Those are exhausted claims, but the plaintiff says that

17  they are -- that he has new evidence supporting those claims.

18      In a sense, this case wouldn't present a problem if the

19  California courts had denied the appellate relief based upon

20  substance, but in fact they denied it based on a procedural

21  determination, as I understand it, and that further complicates

22  the situation.

23      So my question is, which I'd like you both to address --

24  is why shouldn't I stay -- it's called stay and abey, A-B-E-Y,

25  if that's the right pronunciation -- the proceedings to allow

1   McIntosh to present his unexhausted claims to state court as

2   well as new evidence regarding his exhausted claims?  Because

3   the latter might be enough to overcome the timeliness bars

4   under state law.  They may or may not.  I don't know.

5        And that would be the course that I would propose at this

6   point.  So I want your views as to why that's not the right way

7   to proceed or some other alternative, if you have it.

8        And we have the whole morning, so that's probably the good

9   news and the bad news.  So take your time, whoever wants to

10  speak, and then I will allow you to go back and forth on these

11  issues until we're all exhausted, no pun intended.

12            MR. SHAPIRO:  I think that --

13            THE COURT:  Go ahead, Mr. Shapiro.  We will hear from

14  you first, and then I will hear from the State.

15            MR. SHAPIRO:  I think that would not be the right

16  procedure.  My recollection from the State 2006 habeas petition

17  is that McIntosh raised all of the same things that he raised

18  in his 2009 federal petition, and that included the undisclosed

19  relationship between Younge and Quartermain.

20       Now, the mental health evidence about Quartermain

21  certainly is something that we learned about here for the first

22  time, so I agree with Your Honor, that's new evidence.  But --

23            THE COURT:  Isn't that a new claim?

24            MR. SHAPIRO:  No.  Because what it gets to is

25  essentially the claim that Quartermain was completely

unreliable and never -- and those hearsay statements never should have come in.  It's just additional evidence.

     And the State didn't say, "Well, you didn't have enough evidence so your 2006 petition is denied."  It said, "You're too late to raise anything about this."

     So I could come in with a truckful of new evidence and the State would still argue to the state court "he's too late" which is what they argued back in state court in response to the 2006 petition.

     So to send us back there or to send McIntosh back to state court would only result in the exact --

          THE COURT:  But I think what you are saying is exactly what the State would say, but I think the State's wrong when the petition is denied on procedural grounds.  When it's denied on procedural grounds, I think you're entitled to go back and argue it in the state because of new evidence.  That's what I understand to be the case, but you say no, that's not true?

          MR. SHAPIRO:  I don't think so.  On page 2 and 3 of our --

          THE COURT:  All right.  Let me take a look.

          MR. SHAPIRO:  2 and 3 of my reply brief on the summary judgment motion --

          THE COURT:  Hold on.  Hold on.  I've got to get it.

          MR. SHAPIRO:  That was Doc. 225.

          THE COURT:  Yes.  I have it.  Page 2 and 3.

1    **MR. SHAPIRO:**  I cited to a few cases that say that you
2   don't have to keep sort of bouncing back and forth.  If
3   evidence is developed during the federal proceeding, you don't
4   have to bounce back to state court and say "Well, what about
5   this and what about this?"  You know, would that change your
6   mind about a procedural, a timeliness issue?
7    **MS. CRITCHFIELD:**  What page?
8    **MR. SHAPIRO:**  Pages 2 and 3 of my page numbers.
9    **THE COURT:**  So you say under the *Slutzker vs.*
10  *Johnson* --
11   **MR. SHAPIRO:**  *Slutzker*, *Gimenez vs. Ochoa*, *Gonzalez*
12  *vs. Wong*.
13     The Ninth Circuit, the Third Circuit have said no, if you
14  ended up in federal court because the state denied a state
15  petition on timeliness or procedural grounds, you can finish in
16  federal court.  You don't have to keep bouncing back and forth.
17     And I don't think the State's ever going to say here,
18  "Don't worry, we won't argue these new claims are untimely."  I
19  mean, if they committed to that here and they were to say, "I'm
20  going to tell the state court I'm never going to" -- you know,
21  "these are not untimely claims because we just told the
22  defendant about -- the inmate about these things," and she's
23  not going to say that because I don't think a State prosecutor
24  would say that.  Of course they're going to try to preserve
25  every argument they have to try to defeat the petition.

1          **THE COURT:**  So you say I can consider the new

2    evidence?

3          **MR. SHAPIRO:**  Yes.

4          **THE COURT:**  Under --

5          **MS. CRITCHFIELD:**  May I interject?

6          **THE COURT:**  I just need a moment --

7          **MS. CRITCHFIELD:**  Okay.

8          **THE COURT:**  So, Mr. Shapiro, are you saying that I can

9    conduct a *de novo* review of the claims about Quartermain's

10   mental illness?

11         **MR. SHAPIRO:**  Yes.

12         **THE COURT:**  Well, let's hear from the State.  What do

13   you think?

14         **MS. CRITCHFIELD:**  It is true that the evidence that

15   the petitioner brings to overcome the bar, the procedural

16   default, that evidence in federal court does not have to have

17   been before the state court.

18      If the Court -- a court rules then that the bar is

19   overcome, which is where we are in this process, that he has

20   overcome the bar by showing cause and prejudice, we've never

21   considered the merits of this petition.

22         **THE COURT:**  Right.

23         **MS. CRITCHFIELD:**  And my argument is it's untimely

24   and, in the alternative, it's procedurally defaulted.  And I

25   would like to expand on that, but I'll answer your question

1    first.

2         It's true that the evidence that has been brought up here

3    or that's been discovered here over the last three years during

4    discovery, yeah, that wasn't before the state court, and the

5    Court can certainly consider that in deciding whether the bar

6    has been overcome.

7         To the extent that it supplements any of the claims on the

8    merits, which is of course what petitioner is proposing, that

9    has never -- those facts have never been before the state

10   court.  That would -- those claims would be unexhausted, even

11   if they're additional facts to a claim.  So that would have to

12   go back to be exhausted in state court.

13        And I can give you a detailed analysis of what's been

14   exhausted and what hasn't been.  I'd prefer to do that in

15   briefing, I believe, than just standing here.  Some of the

16   claims -- many of the claims were exhausted and some of the

17   claims were denied in a petition by the California Supreme

18   Court denying a petition for review way back in 1992.

19        Those claims were exhausted and -- on the merits, the

20   state court reached those claims on the merits.  There are

21   maybe two or three in Mr. McIntosh's 2009 petition.  That's the

22   only habeas petition before this Court at this time.  There is

23   no other habeas -- he hasn't filed an amended petition.  He

24   needs to get leave of the Court and then file an amended

25   petition, adding all his claims, supplementing his claims.

1    Then I would respond, the State would respond, saying this is

2    unexhausted, this is unexhausted, and then addressing them on

3    the merits, and then the Court would decide what they wanted to

4    do.

5            **THE COURT:**  So you think that's the better way to

6    proceed?

7            **MS. CRITCHFIELD:**  Yes, number one, but actually --

8            **THE COURT:**  Grant -- or he's not asking for it.  I

9    don't know whether he's asking for it or not, but direct

10   plaintiff to file an amended petition with all of these claims

11   in it --

12           **MS. CRITCHFIELD:**  Yes.  If you get that far.  If you

13   decide, Your Honor, that this petition is not untimely and/or

14   procedurally barred -- that is the question before the Court at

15   this point.  If you decide that it is timely and that it is not

16   procedurally barred, then, yes, I think he needs to file an

17   amended petition because there is no way that the State can

18   look at the claims that he made -- that Mr. McIntosh made in

19   2009 and then somehow supplement those -- read a crystal ball

20   to supplement those in the way that he wants them supplemented.

21   He would have to file a new Amended Complaint, and then we

22   could look at that and tell you "this is unexhausted, this is

23   unexhausted, this was decided on the merits, this was decided

24   by a procedural bar."

25           But, Your Honor, before you get there, we need -- I would

1   like to propose that this petition is untimely, and it's

2   untimely -- you don't even have to reach the procedural bar

3   issue.  He has not shown he's entitled to statutory tolling,

4   equitable tolling, the equitable exception of actual innocence

5   or delayed discovery.  He has not shown any of that.  This is a

6   run-of-the-mill untimely petition.

7        He didn't file -- he didn't start filing in state court

8   until 2006.  That's when he filed his first petition in the

9   San Mateo County Superior Court.  His conviction was final in

10  1992.  AEDPA was enacted in '86.  The statute ran on the 24th

11  of April in 1997.  He did not even get to superior court until

12  2006.  This petition is untimely.  We don't need to reach the

13  merits, whether the '09 petition or an amended petition.

14       In the alternative, Your Honor, it is procedurally barred.

15  You don't need to reach the procedural bar issue.  It was --

16  it's -- the state -- it's untimely under the AEDPA.  The state

17  happened to deny with -- deny the petition in -- before the

18  California Supreme Court, and the California Court of Appeal

19  denied the petition with a cite to *In Re Robbins*.

20       The Supreme Court subsequently decided that's a good bar,

21  *Walker vs. Martin*.  They said yes, California has a right to --

22  and it's used properly.  And so I argued in the alternative

23  that the petition is procedurally barred.

24       But the timeliness issue is straightforward, it's simple,

25  it's the best way forward.  That needs to be considered first

1    before we talk about him filing an amended petition and whether

2    we're going to consider anything on the merits.  We're not at

3    the merits.

4         **THE COURT:**  Mr. Shapiro, why isn't it timely barred?

5         **MR. SHAPIRO:**  Well, I think Ms. Critchfield raised a

6    few different things besides what your question was --

7         **THE COURT:**  I think that's right, but, I mean, what

8    counsel is saying is "Look, Judge, you're getting ahead of this

9    game a little bit.  You have to decide that it's not -- that

10   it's timely and you have to decide that it's not procedurally

11   barred."

12        And let's take the first step first because she says

13   that's just clear; it's simply not timely.

14        **MR. SHAPIRO:**  Well, I think the simplest answer -- and

15   I've raised several reasons why it's not untimely here.  But

16   the simplest one for me to understand is the State withheld

17   evidence, the federal government withheld the exculpatory

18   evidence, the impeachment evidence.  The statute of limitations

19   begins to run when that's disclosed.  That actually -- some of

20   it was disclosed during these proceedings.

21        But it's more than that.  It's more than that.  If you

22   look back at the procedural history of what McIntosh was doing

23   and doing on his own from prison, which is, you know -- over

24   and over again the Ninth Circuit says you have to cut people

25   like him some slack.  He filed within a year of the adoption of

1    AEDPA in this court, and I think it was originally assigned to

2    Judge Walker and then became assigned to Your Honor.

3        If you look back at the filings in that case, McIntosh

4    believed -- and there's one -- one document I think I did not

5    attach.  It's Document No. 14 in that 1997 petition where he

6    says -- first he moves to amend to take out his unexhausted

7    claims.  Then Your Honor says in the first order, "I've got to

8    dismiss," you know, "these mixed petitions under the *Rose vs.*

9    *Lundy* test," which of course ends up being changed over time.

10   Right?

11       So then McIntosh writes to the Court.  He files a motion

12   to withdraw.  And he said as he understands it -- and he files

13   this -- in his motion to amend, he files this several-page

14   document essentially asking for legal advice, and we know the

15   Court is not going to give an inmate legal advice.  But

16   struggling to understand what -- what is this new AEDPA thing

17   and how does it work?

18       And he says, "The Court's order" -- and this is Document

19   14.  I'm 99 percent sure.  "The Court's order of July 13, 1998

20   indicated McIntosh has the choice of withdrawing the current

21   2254, returning to state court to fully exhaust all claims,

22   then, if necessary, resubmitting one all-inclusive habeas

23   corpus in federal court."  And then the Court issued an order

24   essentially saying, "Yes, do that."

25       So the State cited to a couple -- or three cases from the

1    Ninth Circuit that say once you dismiss a petition, it's dead;

2    right?  You don't revive it.  But what the State didn't cite

3    to -- and I fault myself for not citing it to Your Honor in my

4    reply because I just missed it -- a case decided the same year

5    as that *White vs. Greene* case or *Greene vs. White* case that

6    said an original petition is dismissed -- a case involving

7    Michael Anthony, the same Michael Anthony who's involved in our

8    case, where the Ninth Circuit said that a court has the

9    equitable power to treat the new petition, the later-filed

10   petition, *nunc pro tunc* filed as of the one that had been

11   dismissed when there was a mistake made, whether it was --

12          **THE COURT:**  What's the cite?

13      **MR. SHAPIRO:**  I have copies.  It's 236 F.3d 568.  And

14   that case has been reaffirmed by the Ninth Circuit several

15   times.

16      So, you know, putting aside the cause and prejudice test

17   and the actual innocence test, you have a man sitting in prison

18   doing his best to follow guidance from the Court, guidance from

19   the statute, and probably guidance from, you know, jailhouse

20   lawyers, "How do I make sure my claim gets filed?"  And what he

21   filed in that 1997 petition was "These two people who basically

22   testified against me, Quartermain and Younge, they're

23   incredible, they were accomplices."  That's the essence of his

24   case now.  Now there is a lot more evidence to back it up.

25          **MS. CRITCHFIELD:**  Actually, that's not true.  That's

1  not right.

2  THE COURT:  What's not true?

3  MS. CRITCHFIELD:  The '97 petition did not include

4  claims about Quartermain and Younge.  The '97 petition was

5  basically claims -- I can tell you what the claims were.

6  MR. SHAPIRO:  Well, can I finish my point?

7  MS. CRITCHFIELD:  I'm sorry.

8  THE COURT:  Yes.  Go ahead.

9  MR. SHAPIRO:  It does, and we can all look at it, but

10  it definitely -- he definitely did in the way that -- in a way

11  that an inmate would write.  What he wrote was --

12  THE COURT:  Well, counsel is referring to the petition

13  and stating that the petition didn't have this in it.

14  MS. CRITCHFIELD:  Right.  So the '97 petition raised

15  three claims that were unexhausted and four claims that didn't

16  state a federal claim.  He never stated any constitutional --

17  federal constitutional violation.  So you dismissed it without

18  prejudice, denied it without prejudice, for him to return to

19  state court and exhaust and then return back to federal court.

20  He waited nine years until 2006 --

21  MR. SHAPIRO:  Well, actually none of that is true,

22  Your Honor, I mean, if we're going to interrupt each other.

23  Here, I found it.

24  THE COURT:  Let's let Mr. Shapiro finish.

25  MS. CRITCHFIELD:  Okay.

1          **MR. SHAPIRO:**  So in his petition at page 20, he said,

2     "The jury instructions gave Younge's testimony more credibility

3     than it deserved."  These are examples that I jotted in my

4     notes.  The petition at 25, "The fact that Quartermain lied to

5     Younge and/or Younge lied to the jury, surely there was to be

6     some indicia of reliability before hearsay statements can be

7     introduced to the jury."

8          Now, his legal theory was the trial court had made errors

9     in admitting hearsay statements or in giving a jury instruction

10    that didn't call Younge an accomplice, didn't give the

11    accomplice instruction.  But the essence of his claim and why

12    that's important is it's the common facts that matter, not

13    legal theories that matter under that *Mayle* Supreme Court case,

14    and he raised that issue and he wanted to raise the argument in

15    this court about what the testimony was against him.

16         So then he thinks -- and I think any fair reading of your

17    order or his filings would say he thinks he can go to state

18    court and then come back.  He thinks he essentially has a stay.

19    So he goes and files again in 2006, and I've outlined what

20    happened during those years.  He was cooperating with the

21    federal government and with the state government, not this

22    state government, a different state government, and became a

23    witness in a high profile murder case.  He thought he was going

24    to get clemency and/or a reduction of his sentence because

25    that's what he had been told.

At the same time, he's meeting people who are telling him things about David Younge.  And he eventually, when he gets an investigator -- he eventually gets declarations from these people.  So he's acting diligently the entire time.  There isn't a day that he isn't trying to figure out what happened and what the truth was about these witnesses against him.

And he files in 2006.  Now, the State says, "Well, that was untimely."  Well, maybe it was untimely in state court because that's what the state courts have said, that's untimely.  It doesn't matter that you didn't know it or you had no access to this information.  We're saying it's untimely.  But that doesn't bind Your Honor.

What we look at here is why did he have to wait so long to file these declarations and file his petitions?  Well, because he wasn't getting any information.  And there are so many cases in the Ninth Circuit that have said when the State withholds that evidence, that's a good cause for why he didn't file.

And then you look at well, how bad was it and -- to see whether there was prejudice, and you couldn't get better impeachment evidence than what was developed in Mr. McIntosh's case.

You have got the FBI and the State investigator calling up a cop in Marin County and convincing him not to investigate the main witness in the case.  That's a silver bullet if you're cross-examining that person on the stand.  And he didn't have

1    any of that.  So you can't say well, this is just untimely or

2    that's what the State's argument is.  You can't say that.

3        So that's just one thing when I say you can *nunc pro tunc*

4    consider it filed as of '97 within the AEDPA statute, but then

5    you look at all that other stuff -- the cause and prejudice

6    test, the actual innocence test -- and he is timely.  Now, this

7    is getting away from your original question about exhaustion

8    and whether we have to go back to the state court.

9        And, you know, the one other point -- and then I will stop

10   talking.  The one other point to address what Ms. Critchfield

11   said is I expected her to make this argument that it wasn't

12   exhausted, so in April of 2015, I filed a renewed and

13   supplemental petition and I said, "Here's a renewed and

14   supplemental petition."  The State didn't say, "That's not a

15   real amended petition" or "I'm moving to dismiss it" or "That's

16   somehow inadequate."  And it didn't say, "Oh, you've got to go

17   raise these new claims over in state court."  It didn't say

18   anything except, "We reserve our right to some day maybe do

19   something."  That's a waiver.  Because if she had -- if she had

20   a complaint --

21       **THE COURT:**  I don't understand that's a waiver.  I

22   mean, that doesn't sound like a waiver to me.

23       **MR. SHAPIRO:**  She could have said he didn't --

24       **THE COURT:**  What she could have said isn't the same

25   thing as saying she therefore waived her right to say anything,

1     or at least I don't think it is.

2              **MR. SHAPIRO:**  Well, we could have had this argument --

3              **THE COURT:**  I know.  I know.  Believe me, we could

4     have had this argument in 1990 something, but nobody did.

5              **MR. SHAPIRO:**  Right.

6              **THE COURT:**  Or it wasn't and we're now 2017 and none

7     of us is getting younger, including the petitioner.

8              **MR. SHAPIRO:**  That's right.  He's an old man at this

9     point.

10             **THE COURT:**  How old is he?

11             **MR. SHAPIRO:**  He's probably 78.  He had some very

12    serious health problems in prison as well where they had to

13    take him to a hospital and --

14             **THE COURT:**  Okay.

15        Yes?

16             **MS. CRITCHFIELD:**  So essentially I think the argument

17    is that the petition that was filed in '97 somehow is still

18    alive -- was still alive when he filed or still pending when he

19    filed the 2009 petition.  So I'd like to go back and say that

20    the '97 petition was filed three days before the AEDPA statute

21    of limitations ran.  It included mostly an exhausted -- I think

22    there was one or two -- one exhausted claim and mostly

23    unexhausted and claims that didn't state a federal claim.  So

24    it was dismissed without prejudice to return to go exhaust and

25    come back.

1          The argument now is that he then did that within the nine

2     years.  Nine years later, he goes back to the San Mateo

3     Superior Court and exhausts a petition that is completely

4     different, and there's -- I can lay out the claims.  It's a

5     very different petition.

6          So there are several exceptions that could excuse that

7     nine-year delay.  It would be statutory tolling, which I think

8     he's trying to bootstrap himself into a statutory tolling

9     argument somehow saying that you were supposed to do a stay and

10    abey order on that petition, which is completely without any

11    legal support at all.  So that's a statutory tolling.

12         There is an equitable tolling, which I also hear him

13    saying, which is that there was an extraordinary circumstance

14    that stood in his way that was the "but for" cause of him not

15    returning to federal court.  That's equitable tolling.

16         It appears that the "but for" -- that the extraordinary

17    circumstances that you dismissed without prejudice, and he had

18    a difficult time finding the evidence so that he could beef up

19    his claims.  That is not equitable tolling.

20         **THE COURT:**  Isn't he saying in that regard, giving him

21    his due -- he's saying that the evidence of -- that he needed

22    was within the State's control and the State didn't furnish it

23    to him, and so how do you --

24         **MS. CRITCHFIELD:**  Yes.

25         **THE COURT:**  How do you expect him to produce that

1    evidence when in fact, one, he doesn't have it, and, two, the

2    State isn't giving it to him?  That's what he's saying.  And

3    that's a good basis for equitable tolling.

4            **MS. CRITCHFIELD:**  Well, actually, Your Honor, it's

5    delayed discovery.  That exception to AEDPA is delayed

6    discovery under 2244(d)(1)(D).  And that, yes -- if you find

7    some evidence that presents a new claim, you have to file the

8    petition within one year of discovering that evidence because

9    of course that happens.

10           So he -- I think that delayed discovery is probably the

11   main -- the other one is the actual innocence which is just an

12   equitable exception to the AEDPA statute of limitations.  And

13   actual innocence is an extremely high bar.  You have to have

14   solid evidence that you did not commit -- most likely did not

15   commit the crime.

16           In all due respect, I don't believe anything he's put

17   forward shows that, demonstrates that.

18           But going back to delayed discovery, because I think

19   probably -- I don't want to make his argument, but I feel like

20   that probably is the closest one that he can come under.

21           There are several things that are a problem with that.  He

22   even gives it away himself.  He claims that when he filed the

23   '97 petition, he knew that Younge perjured himself and lied

24   about this relationship, this prior relationship he had with

25   Drax Quartermain, who was the killer, the hitman.

1   He knew the delayed discovery has a very strict due

2   diligence requirement.  It's when you knew or should have known

3   of the claim, that you have a year from then to bring it;

4   otherwise, the exception drives the truck through the rule.

5       So he admits it, that he knew there was some issue with

6   the Younge and -- possibly with the Younge and the Quartermain

7   relationship.

8       I actually have further proof that he knew it in the early

9   '90s, all of these claims.  First of all, the Jim Greene and

10  the Debbie Chandler claims are trial claims.  They were all --

11  it all -- all the information for those claims was available at

12  the time of trial.  That's when you -- in 1990.  That's when

13  you knew or should have known.

14      Secondly, when Mr. McIntosh filed a -- his pro se federal

15  position here in 2009, he submitted a declaration -- two

16  declarations as exhibits to that petition.  One of the

17  declarations, Exhibit O, states that back in 1992 when he was

18  in federal prison serving his time for the escape conviction,

19  he met Carl Jackson who told him about the prior relationship

20  with Younge and Quartermain.  And he then tried -- he hired a

21  private investigator in the '90s who didn't get very far with

22  it and then became ill and ended up not helping him.

23      So he files his position.  He alludes to some of this in

24  the '97 petition.  It gets dismissed without prejudice.  Then

25  he waits until 2006 to file the next petition, and the excuse

is, "Well, the State was withholding the information."  The
State didn't withhold any of that information, number one.
Number two, his excuse is "Well, it was only until then that I
could hire a private investigator."  That doesn't get you the
due diligence exception.  It's when you knew or should have
known and you have to pursue it diligently at that point.  And
he didn't.

     And petitioner now makes it all the State's fault.  But
the State didn't do anything.  And I will also respectfully say
there's nothing withheld that's of any moment.

     So does that make sense?  So he really -- he has statutory
tolling, equitable tolling, the delayed discovery, discovery
under 2244(d)(1)(D), and then the actual innocence exception.
That's the only thing --

          **THE COURT:**  I think I have to ask Mr. Shapiro, is the
delayed discovery the equitable tolling argument essentially?
Is that why you are saying it should be equitably tolled?

          **MR. SHAPIRO:**  It should be equitably -- the cause
was -- the delay of discovery was the nondisclosure of
evidence.

     And if I can address Ms. Critchfield's points briefly,
I'll start with that last one, the Jackson meeting.  He did
meet Carl Jackson in prison, and Carl Jackson did tell him
something.  But the case law says you don't have to file the
minute you get some evidence.  If he had filed his petition

that moment, he -- it would have been like one guy saying in

prison that there was a prior relationship.

The cases say you can work at diligently trying to get

information about whatever the subject matter is of your

Complaint.  There is no question that that's -- it would be

crazy -- every time an inmate had a conversation with another

inmate and he thought it helped his case, he'd be filing a

petition and then another petition and then another petition

and then asking to supplement it.  That doesn't make any sense.

The actual innocence test is not that he has to prove that

he wasn't guilty.  He has to prove that the new evidence

undermines confidence in the verdict.  And that really goes to

these *Napue* and *Brady* errors where the State put on false

testimony knowingly, where the State did not disclose

incredibly important information.

It's shocking to me that the State could stand here and

say that the mental state of the killer whose hearsay

statements came in through a slick con man and the jury

heard -- two of the most significant ones were later held by

the California Court of Appeal to have been inadmissible, that

that was -- it's sort of insignificant information.

He was a psychotic.  And he suffered -- I can't remember

the exact phrase.  There is a psychological phrase and I put it

in my declaration.  People with this mental illness can go

through an innocent interaction with some people and think

1    there's all sorts of terrible things and criminality happening.

2    And that a defense lawyer could have used with respect to that

3    so-called eyeball meeting.

4        So Quartermain tells Younge, "I'm going to eyeball the

5    victim."  They go to this cafeteria or restaurant, and they

6    happen to see McIntosh and -- they say they see McIntosh and

7    Anthony and Ronald Ewing.  Now, the only thing the jury heard

8    in that instance was Younge saying what Quartermain said the

9    reason for the meeting was, but there was no actual meeting.

10   The prosecutor made a big deal about how they didn't interact

11   with each other.  It could have been all a made-up thing in

12   Quartermain's head.  The jury didn't know anything like that.

13       So the point is that this evidence that the State withheld

14   that was in its files was the -- as significant the kind -- of

15   the kind of impeachment evidence that you can get in a criminal

16   case.

17            **THE COURT:**  It's hard to say -- that statement, it's

18   hard to say that's wrong.  I mean, it is very significant.  I

19   mean, the person is mentally ill.

20            **MS. CRITCHFIELD:**  But --

21            **THE COURT:**  I mean --

22        **MR. SHAPIRO:**  If I could just --

23            **THE COURT:**  Not say anything.  Don't say anything

24        **MR. SHAPIRO:**  That's right.  And a crazy person like

25   him could say, "I was told to kill this guy."  Right?  It could

```
1    be completely false.  But the jury didn't know it because they

2    only heard it through, you know, a con man, a guy who speaks

3    well and who had testified probably 30 times.

4              THE COURT:  Who himself is not mentally ill.  He may

5    have certain problems --

6              MR. SHAPIRO:  He is not mentally ill.

7              MS. CRITCHFIELD:  Actually, though, Mr. Quartermain

8    had his own trial and received the death penalty for the hit

9    that he took on Ronald Ewing.  So any of the -- and that came

10   before McIntosh's trial.

11             THE COURT:  I assume he is living today.

12             MS. CRITCHFIELD:  No.  Actually he died in 2003 on

13   death row.

14             THE COURT:  Oh, well, that's actually how people die

15   in California.

16             MS. CRITCHFIELD:  But not the normal way.  Not the,

17   you know --

18             THE COURT:  The State doesn't -- it's not the death

19   penalty --

20             MS. CRITCHFIELD:  Not the death-penalty way.

21             MR. SHAPIRO:  A couple other corrections to what

22   Ms. Critchfield said before.

23        She said that somehow McIntosh admitted that he knew

24   Younge lied about the prior relationship in 1997, but that's

25   not what he said.  That's not what he said.
```

What he said was he heard it -- right?  He heard it from other people.  And, you know, he began to pick at what the State's case was, and he did it in the only way that somebody who is sentenced to life without possibility of parole could do it.

And then the only other thing that I wanted to add to what Ms. Critchfield said before was that the Greene and Chandler new facts were trial evidence, I think she said.  But it's not true.  What happened with Chandler and what we detailed in my declaration and all of the evidence was that she admitted afterwards that the State prosecutor and the police had fed her information about what she then testified about.

I mean, I went through this whole analysis of where -- where did she get this phrase that she used at McIntosh's trial about two rich guys hired Quartermain to kill Ewing.  It came from the police.  It came from the State.

And with respect to Greene, he couldn't know until Greene admitted that he had been intimidated, and he couldn't know that the State prosecutor had sent the police down to find Greene in order to interview him.  We didn't know that until the assistant DA admitted it in response to interrogatories.

He didn't tell Mr. Philipsborn, who was McIntosh's lawyer, "By the way, my cops, my investigators went down and interviewed your witness and he's not coming."  Because if you look at the evidence and the way that Philipsborn did his

examination of the police officer, of Singleton, he was trying

to get him to admit that there was this nine-minute phone call

from the McIntosh home to the Greene home and that would

support his alibi because he couldn't get Greene to come to

court, and Singleton said, "I didn't know anything about that."

He didn't say, "Yeah, I interviewed that witness and I did talk

to him."  He didn't admit it.  So that's what the truth is

about those two witnesses.

    And all of it goes to both the actual innocence exception

and the cause and prejudice tolling argument.

        **THE COURT:**  This is a procedural nightmare.

        **MS. CRITCHFIELD:**  Well, actually it's not.  It doesn't

have to be.  It doesn't have to be.  And I would like to

again -- let's go -- let's narrow this down and talk about the

most direct, fast-forward way here, and I'm happy to do

additional briefing on this.

    The petition is untimely under the AEDPA.  He has four

ways that he can --

        **THE COURT:**  But you've argued that.  You've argued

that.

        **MS. CRITCHFIELD:**  Okay.  I want to say one thing about

this so-called evidence or this evidence of Mr. Quartermain's

mental health records that were diagnosed by prison officials

from -- between the years of 1955 and 1965, and of course,

remember, the trial here was 25 years later in 1990.

1    Mr. Quartermain didn't testify because he was a

2    co-conspirator, and so his statements came in through David

3    Younge, and David Younge was actually -- the jury was

4    instructed to decide if the --

5         **THE COURT:** I don't -- I'm sorry.  I'm trying to

6    understand why that's a meaningful distinction.  In other

7    words, I'm trying to understand that if Jones, who is severely

8    mentally ill, tells Smith X, Y and Z, and Smith comes in and

9    testifies that Jones said X, Y and Z, why it's irrelevant

10   that -- whoever the person was, I've already forgotten -- is

11   mentally ill.  I don't understand that.

12        All the Rules of Evidence that I'm aware of have to

13   suggest that -- if, for example, you're making admissions

14   against penal interest, if in fact there is some exception to

15   the hearsay rule, if in fact it's statements in the furtherance

16   of a conspiracy -- so all the general rules about admissibility

17   of out-of-court statements, they're all premised on at least

18   the fact that the person who is speaking has sufficient

19   competence to say X, Y and Z, and if they're severely mentally

20   ill, I can't see that a judge would allow that in.  That's --

21   do you disagree with that?  Not in the context necessarily of

22   this case, but I just can't see how a judge would let that in.

23   Really?

24        **MS. CRITCHFIELD:** If, in fact, those records -- I'd

25   like to go back before we even talk about these records of the

1    mental -- the prison mental --

2          THE COURT:  I thought you introduced -- that's what

3    you were talking about, I thought.

4          MS. CRITCHFIELD:  Those records were disclosed during

5    this last --

6          THE COURT:  But answer sort of my question first.  If

7    the person -- if the out-of-court declarant is severely

8    mentally ill --

9          MS. CRITCHFIELD:  At the time he made the statements.

10          THE COURT:  That's right.

11          MS. CRITCHFIELD:  At the time he made the statements.

12          THE COURT:  Well, but it's a fair inference that he

13    was.  In other words, I don't think he had a medical diagnosis

14    as of the day that he purportedly declared X, Y and Z, unless

15    he did.  I don't know.  But, I mean, I'm just saying that if,

16    in fact, the person -- it's reasonable to infer that the

17    person, when he made the statements, was suffering from a

18    mental disability that would impair his credibility and the --

19    I find it hard to believe that a trial judge would permit that

20    type of evidence to go to a jury.

21        As a general proposition -- forget the case, but you're

22    now a lawyer in front of me discussing a general proposition of

23    the law, do you disagree with that or do you agree with that?

24          MS. CRITCHFIELD:  Yes.  But that's not the facts here.

25          THE COURT:  Okay.  Fine.  But at least -- because

1    Mr. Shapiro says yes, it is.  I think he is saying that.

2            **MR. SHAPIRO:**  Yes.

3            **THE COURT:**  Unless I'm hearing something differently.

4        So if he's saying that and you say well, as a general

5    proposition that's correct, then I have a point -- I have a

6    platform at least to understand.

7        I mean, if the law were it makes no difference how

8    mentally ill a person is, you know, who makes a declaration to

9    X, and X comes in to testify, I'd say well, I sort of look at a

10   harm, prejudice, and so forth analysis and say he could have

11   gotten it in anyway even if he had known all those things.  He

12   could have gotten it in anyway.  The way I look at it is he

13   probably couldn't.  He couldn't as a general proposition.  So

14   I'm actually satisfied on that particular issue that

15   Mr. Shapiro is correct.

16       On the timeliness issue, I think I have to give some more

17   thought to it to see whether your silver bullet or whatever you

18   want to use as an analogy, you know, is really dispositive.

19       The mental illness issue, if it is a new claim, then I'm

20   not sure it's an exhausted claim.  If it's sort of more

21   evidence of the old claim, then I think I would, you know --

22   arguably it was exhausted.  I'm unclear as to that.  Maybe you

23   can address those issues to see whether you have agreement or

24   disagreement on that issue.

25           **MS. CRITCHFIELD:**  May I address the evidence -- the

evidence of the diagnosis of Drax Quartermain between the years
of 1955 and 1965 by prison officials as being mentally ill was
25 years before the trial and 20 -- approximately 20 years
before the crime, which occurred in 1984.

Mr. Quartermain was tried.  There was no mental health
issues raised at his trial, and one would think if one were on
death row or facing a death row conviction that the mental
health would be an issue raised by defense counsel.

No. 2, I would like to elaborate or make sure the Court is
clear on where this mental health evidence came from.  In 2014
this Court ordered me to have the District Attorney release
their files, the DA's files.  The DA who tried this case is
long retired.  I got ahold of the chief assistant.  She went
through and culled out -- she went through, found the three
case files in the DA's archives, culled out anything she
thought was either work product or confidential.  She says in
her declaration, "I don't have any idea what was released or
what was given to the defense in 1990.  I didn't work on the
case.  I'm just saying now."

So she held that back.  Unbeknownst to me, she held back a
certain amount of evidence -- documents.  We then realized,
when I asked her, that she had held them back.  She then
released them to you and we then released -- you then released
them to petitioner.

Petitioner labels those files as the secret files, as the

1    files that were never released in 1990.  But there is no

2    evidence of that.  There is no evidence -- he makes a jump that

3    just because Ms. Guidotti in 2014 withheld them, culled through

4    them and she says --

5            THE COURT:  But -- okay.

6            MS. CRITCHFIELD:  Does that make sense?

7            THE COURT:  Well, I understand what you're saying.  So

8    I -- it makes sense from that point of view, but I'm not sure I

9    draw the same conclusion that you do, and it's a question of

10   burdens, in my view.

11       In other words, am I to presume that those files which she

12   withheld initially or in response to this proceeding were

13   actually produced to the defense lawyer during the course -- am

14   I to presume that?  Or putting it the other way, am I to

15   presume that they weren't, you know?

16           MS. CRITCHFIELD:  It's his burden.

17           THE COURT:  Well, in other words -- in other words,

18   he -- what we need from him would be a declaration saying, "I

19   never got these."  But, I mean, it's -- since we don't have

20   that -- we don't have any declaration in that sense.  We don't

21   have a declaration from the prosecutor at the time saying, "I

22   furnished them."  We don't have a declaration from the defense

23   lawyer saying, "I never got them," or a declaration from the

24   defendant saying, "I never saw them.  To my knowledge, they

25   were never produced."  Okay.

1    And you're saying we ought to -- since he has the burden

2    and since silent on that issue, I ought to take that into

3    consideration.

4         Well, I'd say that's a pretty big leap.  I don't know what

5    to say.  I mean, the problem I have, to be perfectly frank, is

6    the practices in different district attorneys' offices in the

7    '70s and '60s and '80s were very, very different.  Some DAs

8    would say, "Come on in."  I mean, I was there so I know.  I

9    know the practice, at least in San Francisco, in a homicide

10   case was that nothing was withheld.  Actually they made a

11   duplicate file of the homicide file and turned it over.

12        **MS. CRITCHFIELD:**  Uh-huh.

13        **THE COURT:**  And then if there was some secret witness

14   or, you know, witness who's confidential and so forth, we would

15   make some arrangements with respect to that.  But actually I

16   never even had that.  I mean, in five years of practice, I

17   never had a single document not produced.  That's in

18   San Francisco.

19        San Mateo may be different.  I don't have an opinion.  And

20   though I know that there is a history of different districts

21   doing different things, I know they're not uniform practices

22   throughout the State of California.

23        And, by the way, this was all before there was -- well, I

24   mean, there was always *Brady* requirements.  It was probably

25   before *Giglio*, but there was *Brady* and --

1            **MR. SHAPIRO:**  This is after *Giglio*.

2            **MS. CRITCHFIELD:**  Yes.  Mr.--

3            **THE COURT:**  Anyway --

4            **MR. SHAPIRO:**  If I could just respond to those few

5    things?

6            **THE COURT:**  Go ahead.

7            **MR. SHAPIRO:**  The last one I'll address first.

8        So the defense lawyer in the case I mentioned was John

9    Philipsborn, former federal prosecutor in this district,

10   experienced defense lawyer -- I would say probably pretty

11   experienced by that time and very experienced now.  He asked

12   for a hearing from the trial judge on whether the Quartermain

13   hearsay statements could come in.  That was denied.

14       If he had any knowledge about the mental state of

15   Quartermain, we could be sure he would have said, "Your Honor,

16   look at this.  The guy's crazy."  All right.  That's number

17   one.  So if you're going to draw an inference from the

18   evidence, I don't know that it's my burden -- I don't know what

19   case that says when I present evidence that there are documents

20   that don't ever have appeared to have been produced to the

21   defense and here they are and they're coming in and they were

22   withheld by a supervisor at the DA's office and we don't have a

23   declaration from her that says, "I don't have a clue what was

24   turned over in this statement" --

25           **MS. CRITCHFIELD:**  We do have a declaration.

1          **MR. SHAPIRO:**  Excuse me.

2       She didn't actually say that.

3       And we don't have a declaration of -- Murray was contacted

4    in order to respond to interrogatories and they could have

5    asked him.  I asked to depose him.  I could have asked him that

6    question.  I wasn't able to.  The State objected to that.

7       I could ask John Philipsborn if he remembers any mental

8    health records.  I think I may have.  And I think he said, "No.

9    I know my client never saw any mental health records of Drax

10   Quartermain."

11          **THE COURT:**  We're getting pretty far out of the

12   record, aren't we?  Probably it started with me so I apologize

13   for that, but --

14          **MR. SHAPIRO:**  Could I go to your question on whether

15   it's exhausted?

16          **THE COURT:**  Yes.

17          **MR. SHAPIRO:**  I think it is exhausted in the state

18   because the fact that we develop evidence, additional evidence,

19   that goes to Quartermain's credibility here doesn't mean you

20   have to send it back to the state every single time.  I mean,

21   look how long it took us to get to the last thing, which,

22   frankly, was a bigger bombshell than the mental health records,

23   which was that they shut down a Marin County drug investigation

24   of David Younge.  Right?  That took us years to get to and that

25   was like drips and drabs coming from the FBI of information.

1     If every time we get some new piece of evidence you have

2  to send it back to the state, McIntosh will die in prison.   And

3  that's not fair to him.   And that's not what the cases say from

4  the Ninth Circuit.   That if he raised the claim there,

5  especially since they didn't get to the merits --

6              **THE COURT:**  I understand the argument.

7          **MR. SHAPIRO:**  You know --

8              **THE COURT:**  Anything further?

9          **MS. CRITCHFIELD:**  Two things.

10     We don't need to reach the exhaustion issue until you've

11  decided on the timeliness issue.   If they -- if you decide that

12  this was timely and he's entitled to one of the exceptions,

13  then any new facts that are used to supplement a claim are --

14  need to go back to the state court, if that's how you decide

15  you want to proceed.

16     Two things on the -- this evidence.   I would ask you to

17  look at this evidence honestly.   How much of it -- was it --

18  could it have possibly been prejudicial.

19              **THE COURT:**  Well, let's talk about that just for a

20  minute.

21          **MS. CRITCHFIELD:**  Okay.

22              **THE COURT:**  Quartermain -- the statements that

23  Quartermain made -- allegedly made --

24          **MS. CRITCHFIELD:**  To David Younge.

25              **THE COURT:**  Yes.   Are you saying that they're not --

1   they're not of great weight?  I mean, they're not -- they're

2   not highly prejudicial?  They --

3           MS. CRITCHFIELD:  No, no, no.  The statements -- oh,

4   no.  The statements are really -- the statements that

5   Quartermain made to Younge and then Younge was able to testify

6   to them because of the co-conspirator exception, yes, that was

7   a big part of the trial.

8           THE COURT:  Well, so that's the point.

9           MS. CRITCHFIELD:  Well, no, it is -- Your Honor, it

10  is, except -- except this mental health evidence, how much of a

11  difference -- the DA would have gone in and said, "So,

12  Mr. Younge, isn't it true that back in 1955 to 1965 Drax

13  Quartermain was diagnosed with a mental illness?  So does that

14  make you question what he said to you in 1984?"

15          THE COURT:  It's not whether Younge -- maybe I'm

16  missing it.  It's not whether Younge thought that Quartermain

17  was mentally ill, though that is sort of interesting, whether

18  he is dealing with somebody or talking to somebody who is

19  mentally ill.  That's interesting.  Or involved in it.  That's

20  an interesting fact.  No.

21      The question is the jury is sitting there trying to figure

22  out what weight, if any, to give to these statements, and then

23  they hear that the person who uttered the statements is a

24  lunatic.  I mean, I -- you lose me on this one.

25          MS. CRITCHFIELD:  But, Your Honor, he's not a lunatic.

1          THE COURT:  Well, that he suffers -- that's a very

2     inappropriate term.  That he suffers from a mental illness.

3          MS. CRITCHFIELD:  He may have.  Back from -- in '55 to

4     '65 he was diagnosed in prison --

5          THE COURT:  But that's exactly -- exactly why we have

6     juries.  Exactly why juries weigh things.  Exactly how they

7     come to a conclusion how much weight, if any, to give to

8     particular evidence.  I mean, I've said it for 20 years as a

9     judge and 30 years as a trial lawyer.  It's the jury's

10    determination in that regard.  It's extraordinarily important.

11         And it's not -- if -- I would follow you and accept what

12    you're saying if it was so incidental.  You know, look, number

13    one, witnesses misrecollect.  Witnesses sometimes lie,

14    witnesses do all sorts of things where, you know, it could

15    affect their credibility, but you look at the totality of the

16    evidence and you also look at what the role of that particular

17    statement is.

18         Here I have to tell you -- I have to tell you, and I think

19    you have admitted it, that it was a highly probative part of

20    the trial.  Now --

21         MS. CRITCHFIELD:  No, I don't admit that.

22         THE COURT:  Well, that the statements were probative.

23    Or prejudicial.  I don't know what the right word would be.

24         MS. CRITCHFIELD:  Not in this context, I don't admit

25    that, no.

1          **THE COURT:**  Really?

2          **MS. CRITCHFIELD:**  Absolutely not.

3          **THE COURT:**  Okay.  All right.  Fair enough.  I don't

4     want to put words in your mouth.  That's not appropriate for me

5     to do so.

6          **MR. SHAPIRO:**  Younge --

7          **THE COURT:**  Try to finish up.

8          **MR. SHAPIRO:**  Younge testified that Quartermain told

9     him McIntosh wanted to buy a silencer.  McIntosh ordered --

10     offered him $55,000 to kill Ewing.  Quartermain told Younge, "I

11     killed Ewing.  McIntosh owes me money."  He always included

12     Anthony in the statement.  That was the whole case.

13          **MS. CRITCHFIELD:**  But there was other evidence

14     corroborating --

15          **THE COURT:**  Well, there always is other evidence --

16          **MS. CRITCHFIELD:**  A lot of evidence, Your Honor.

17          **THE COURT:**  Okay.  I think I've actually sort of heard

18     the argument and now I have to go think about it.

19          **MS. CRITCHFIELD:**  Would it be helpful for me to file

20     additional briefing on a --

21          **THE COURT:**  I don't know yet.

22          **MS. CRITCHFIELD:**  -- motion to dismiss?

23          **THE COURT:**  You mean on the timeliness?

24          **MS. CRITCHFIELD:**  On the timeliness issue and talk

25     about the delayed discovery and show you the evidence --

1          **THE COURT:**  I don't know yet.  I don't know.

2          **MS. CRITCHFIELD:**  Okay.

3          **THE COURT:**  Don't have an opinion.  Want to wait.

4     Collect my thoughts.  If you just want me to talk, I can talk,

5     but I don't think that's helpful.  I think it's helpful if I

6     actually give some thought before I say something.

7          **MS. CRITCHFIELD:**  Okay.

8          **THE COURT:**  For a change.  That would be a healthy

9     contrast.  Yes.  Okay.  Thank you very much.

10         **MR. SHAPIRO:**  Thank you, Your Honor.

11         **MS. CRITCHFIELD:**  Thank you.

12         **THE COURT:**  Thanks.  Appreciate it.

13              (Proceedings adjourned at 10:56 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                     <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, March 30, 2017

8

9    *Pamela A. Batalo*

10   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25